NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 21, 2023

S22A1328. MIDDLEBROOKS v. THE STATE.

ELLINGTON, Justice.

After Marina Middlebrooks pleaded not guilty by reason of insanity to charges arising from the stabbing death of her daughter, Sky Allen, a jury found Middlebrooks guilty of murder and cruelty to children in the first degree.[1] On appeal, Middlebrooks contends

---

[1] The crimes occurred on May 2, 2013. On July 10, 2013, a Columbia County grand jury returned an indictment charging Middlebrooks with malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and cruelty to children in the first degree (Count 3). On January 26, 2016, Middlebrooks was re-indicted on the same counts in Richmond County. Following a February 2016 trial, a Richmond County jury found Middlebrooks guilty on all three counts. On February 29, 2016, the trial court sentenced Middlebrooks to serve life in prison without parole on Count 1 and to serve 20 years in prison on Count 3. The judgment indicated that Count 2 merged with Count 1, although it was actually vacated by operation of law. See *Bradley v. State*, 305 Ga. 857, 857 n.1 (828 SE2d 322) (2019). Middlebrooks filed a timely motion for a new trial, which, through new counsel, she amended on May 27 and October 5, 2020. Following a hearing on November 24, 2020, the trial court denied Middlebrooks's motion for a new trial on August 19, 2021. Middlebrooks filed a timely notice of appeal, and the case was docketed in this Court for the August 2022 term and orally argued on November 8, 2022.

that the trial court erred in allowing the State's expert witness to testify as to what happens when a person is found not guilty by reason of insanity. In addition, Middlebrooks contends that "[t]he trial court erred in restricting the testimony of [her] diagnosing psychiatrist," an employee of the Department of Veterans' Affairs ("VA"), "without following the correct procedure" under federal regulations concerning the testimony of VA personnel in legal proceedings. In a related claim, Middlebrooks contends that her "trial counsel was ineffective in failing to object to the limitation of [the witness's] testimony by the [f]ederal [g]overnment and the [p]rosecutor." For the reasons explained below, we affirm.

After indictment in Columbia County, where Sky's dead body was discovered, the case was transferred to and re-indicted in Richmond County, based on Middlebrooks's pretrial statements that placed the alleged criminal acts outside her Richmond County home. Middlebrooks filed a notice of intent to raise the issue that she was insane at the time of the acts charged against her. Before the trial began, the State and Middlebrooks entered into a stipulation that,

"[o]n May the 2nd, 2013, the Defendant, Marina Mae Middlebrooks, acting alone, caused the death of Sky Lyric Allen, by stabbing her in the neck. This act occurred in Richmond County, Georgia." Because the parties stipulated that Middlebrooks killed her daughter, the primary issue the jury had to decide was Middlebrooks's mental capacity at the time she committed the crimes, with the possible verdicts being not guilty, not guilty by reason of insanity, guilty but mentally ill, or guilty.[2] The jury was required to return a verdict of not guilty by reason of insanity if the jury found beyond a reasonable doubt that Middlebrooks committed the crimes charged in the

---

[2] OCGA § 17-7-131 (b) (1) provides:

In all cases in which the defense of insanity, mental illness, or intellectual disability is interposed, the jury, or the court if tried by it, shall find whether the defendant is:

(A) Guilty;

(B) Not guilty;

(C) Not guilty by reason of insanity at the time of the crime;

(D) Guilty but mentally ill at the time of the crime, but the finding of guilty but mentally ill shall be made only in felony cases; or

(E) Guilty but with intellectual disability, but the finding of intellectual disability shall be made only in felony cases.

At the time of Middlebrooks's trial, the fifth verdict option was "guilty but mentally retarded." Since July 1, 2017, the fifth option has been "guilty but with intellectual disability." See Ga. L. 2017, p. 471, § 3.

indictment and also found by a preponderance of the evidence that she was legally insane at that time, that is, she did not have the mental capacity to distinguish between right and wrong in relation to the act.[3] At the beginning of trial, the trial court read the parties'

---

[3] See OCGA §§ 16-3-2 ("A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, that person did not have the mental capacity to distinguish between right and wrong in relation to the act."); 17-7-131 (a) ("For purposes of this Code section, the term . . . '[i]nsane at the time of the crime' means meeting the criteria of Code Section 16-3-2 or 16-3-3. However, the term shall not include a mental state manifested only by repeated unlawful or antisocial conduct."); 17-7-131 (c) (1) ("The defendant may be found 'not guilty by reason of insanity at the time of the crime' if he or she meets the criteria of Code Section 16-3-2 or 16-3-3 at the time of the commission of the crime. If the court or jury should make such finding, it shall so specify in its verdict."); *Bowman v. State*, 306 Ga. 97, 100 (1) (c) (829 SE2d 139) (2019) ("In Georgia, a defendant is presumed to be sane and a defendant asserting an insanity defense has the burden to prove by a preponderance of the evidence that he was insane at the time the crime was committed." (citation omitted)).

We note that Middlebrooks's counsel did not seek a jury instruction based on the other Code section referenced in OCGA § 17-7-131 (c) (1), OCGA § 16-3-3, which provides: "A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime." At the charge conference, defense counsel stated, "[w]e are not claiming a justification delusion defense, [although] we do have a compulsive delusion[,]" because there was no "proof of justification." See *Buford v. State*, 300 Ga. 121, 125 (1) (b) (793 SE2d 91) (2016) ("When a delusional compulsion is the basis of an insanity defense, the delusion must be one that, if it had been true, would have justified the defendant's actions." (citation omitted)); id. (holding that, because the defendant "could not articulate the particulars of any delusion from which he was suffering that would have justified his actions," he could not "establish insanity pursuant to OCGA § 16-3-3").

4

stipulation to the jury and instructed the jury that, based on the stipulations that had been entered into, Middlebrooks's "plea of not guilty by reason of insanity frame[d] the issue that [the jury was] sworn and empaneled to try in this particular case."

The State presented the testimony of investigators and other witnesses as to the circumstances of the crimes. That uncontested evidence showed that, on May 2, 2013, a passerby saw Middlebrooks's car swerve out of its lane on Ray Owens Road in Columbia County and then crash into a tree. The witness called 911. First responders found Middlebrooks in the driver's seat. She was nude except for a sweatshirt and covered in blood. One first responder testified that Middlebrooks "did not appear to be fully conscious." Middlebrooks told the first responders that "someone had done something" to her, but provided no details. To most of the first responders' questions about what had happened to her, she answered, "I don't know. I don't remember." While tending to Middlebrooks, first responders found her two-year-old daughter, Sky, dead on the car's rear floor, underneath a pile of clothes. Sky

5

was also unclothed, covered in dried blood, and had a gaping stab wound to her neck. Her body had already cooled. A bloody pair of scissors lay in the front passenger seat. A medical examiner later determined that Sky had suffered multiple stab wounds, one of which severed a jugular vein, resulting in fatal blood loss. The wounds were consistent with having been created by the sharp edges of an opened pair of scissors. Middlebrooks had multiple puncture wounds and lacerations to her neck, face, chest, arms, wrists, and knee. Her neck wounds were severe enough to require intubation for a few days.

After the State presented evidence of the circumstances of the crimes, Middlebrooks called several witnesses in support of her insanity defense. After being qualified as an expert, Dr. Geoffrey McKee, a board-certified criminal forensic psychologist, testified that he evaluated Middlebrooks in October 2014, when he spent 6 hours, 25 minutes with her, and February 2016, when he spent an hour with her. In addition to administering psychological tests and interviewing Middlebrooks, Dr. McKee reviewed records of previous

evaluations and treatment of Middlebrooks, including a four-week hospitalization at the VA hospital in the summer of 2011, when she was diagnosed with "schizophreniform disorder" and with "post traumatic stress disorder," arising from her 13 months in combat zones in Iraq. Dr. McKee testified that Middlebrooks was readmitted to the VA hospital for two weeks in February 2012 and diagnosed with "schizophrenia continuous, meaning that the symptoms were recurring on a . . . near daily basis," and "schizophrenia paranoid type, which means that she had delusions of persecution, feelings that other people would hurt her even though there was no evidence of that." For example, the records showed that Middlebrooks reported believing that other people wanted her to kill herself. Dr. McKee also reviewed the records from Middlebrooks's five-day hospitalization following her arrest for Sky's death and her hospitalization at East Central Regional Hospital in Augusta that began seven weeks after Sky's death and lasted for about six weeks. In reviewing the records of the VA hospitalizations and the post-arrest hospitalizations, Dr. McKee looked for any indication in those

records that Middlebrooks was "malingering" – faking her symptoms – and he found none.

Dr. McKee testified about his own examinations of Middlebrooks and described some of the fixed delusions she reported, such as that "she could control and slow down time by moving her hands in a particular way." Dr. McKee testified that Middlebrooks reported that, just before the crimes, she stripped herself and her daughter naked, even removing their earrings, "because she believed that to get to heaven she and her daughter would have to die" by their own hands, "but that they had to be naked because the clothes, including any jewelry, would block the spirits from leaving" their bodies. Dr. McKee administered several psychological tests to Middlebrooks, some of which are designed to detect malingering, and he found no evidence of malingering during the course of his own evaluation. Dr. McKee testified that "[c]ommand auditory hallucinations are not uncommon in persons with schizophrenia, but often with people who try to malinger schizophrenia, when they are charged with a crime will tell the

8

examiner that they had a command auditory hallucination" ordering them to commit the particular crime. Dr. McKee found it a significant indication that Middlebrooks was not malingering that, according to the records from her hospitalization in the days after the crimes, she "did not seize upon [a command hallucination] as a way of explaining away all that she had done." Based on Middlebrooks's history and his own evaluation, Dr. McKee diagnosed her with paranoid schizophrenia. In Dr. McKee's opinion, at the time of the crimes, Middlebrooks "suffered from schizophrenia, a serious psychiatric disorder[,]" that "as a result of that disorder she did not have the mental capacity to know right from wrong[,]" and that "the delusional component of that . . . disorder overmaster[ed] her will to resist committing her offenses." Dr. McKee testified that, in his more than 40-year career, he had evaluated more than 40 women who had killed one or more of their own children. Out of those 40 cases, Dr. McKee had found that only 4 of those mothers, including Middlebrooks, were insane.

Dr. Donna Schwartz-Watts, the chief psychiatrist for female

9

patients at Patrick B. Harris Psychiatric Hospital in Anderson, South Carolina, also testified as an expert witness. Dr. Schwartz-Watts evaluated Middlebrooks in February 2014, when she spent "over two hours" with her, and "saw her again a period of time later." Like Dr. McKee, Dr. Schwartz-Watts reviewed records of Middlebrooks's previous mental health treatment, including just after she killed Sky. Dr. Schwartz-Watts also reviewed statements by witnesses to the crash, Middlebrooks's emergency treatment, and her arrest; examined detention records; and interviewed Middlebrooks's mother and other witnesses. She found that Middlebrooks exhibited a common symptom of schizophrenia, a type of delusion called "ideas of reference," and a very rare symptom, called "clanging." She explained that, rather than expressing thoughts that were connected rationally, Middlebrooks would say words in a sequence that were related to each other only by "the sound of the words." Dr. Schwartz-Watts described clanging as "one of the most severe and regressed forms of thought process, of connecting thoughts together," and testified that it is a difficult

symptom to fake. In Dr. Schwartz-Watts's opinion, Middlebrooks's notes and drawings when she was intubated in the days after the crimes revealed signs of paranoid and delusional thinking. Dr. Schwartz-Watts testified that Middlebrooks reported that, in the days before she killed Sky, she was having recurrent delusional thoughts and compulsions that she and Sky "each had to commit suicide." Middlebrooks said that she believed that God had given her and Sky a "green aura" that made them "special and unique" and that she and her daughter were being "persecuted" by people who "would mean them harm" because "they would want to have access to that gift[.]" Middlebrooks told Dr. Schwartz-Watts that, by committing suicide, she and Sky would "go to heaven so that they would be safe." Dr. Schwartz-Watts testified that "morally [Middlebrooks] believed that she was doing God's will" and that, for Sky to go to heaven, "[Sky] had to kill herself. [Middlebrooks] could not kill her daughter. So she took the scissors and had her daughter stab herself, helping her with the scissors. She stabbed her daughter thinking it's the daughter's hand[.]" Then Middlebrooks stabbed

11

herself and started driving to the marina, where she planned to finish killing herself. Middlebrooks explained to Dr. Schwartz-Watts that she was not completely naked when she crashed into the tree, because she put on a sweater after seeing a police officer stop another car and she did not want the police to stop her and prevent her from reaching the marina and completing her suicide. Based on Middlebrooks's history of paranoid delusions and hallucinations, her psychotic behavior around the time of the crimes, and psychotic thinking that Dr. Schwartz-Watts personally observed during her evaluation sessions, she diagnosed Middlebrooks with acute schizophrenia. In Dr. Schwartz-Watts's opinion, at the time of the offense, Middlebrooks did not "recognize[e] what she was doing was wrong," but thought "she was doing the right thing" when she killed Sky.

Dr. Donald Evans, a staff psychiatrist at the VA Medical Center in Augusta, testified about Middlebrooks's two prior

hospitalizations in that facility.[4] He testified that in July 2011, Middlebrooks, an Iraq War veteran, "was admitted in a psychotic state, meaning, her reality was so distorted that she couldn't trust her senses." That hospitalization lasted approximately four weeks. During that time, Dr. Evans testified, Middlebrooks expressed that "[s]he was disturbed by what she described as people knowing what thoughts were in her head, putting thoughts in her head, or taking some of those thoughts out. And then she had some paranoid ideas that people were going to hurt her, and her physiology reflected that." Middlebrooks was placed on antipsychotic medication that was "meant to help return thinking to cohesive functioning" and "quiet down" distorted thinking in the form of hallucinations or delusions. Dr. Evans read from a progress note in Middlebrooks's chart, showing that the medications were given to treat "schizophreniform," and he explained that "[s]chizophreniform is a diagnosis for a disturbance of perceptions that last for a period of

_____

[4] As discussed in Division 2, infra, Evans testified as a fact witness only, not as an expert.

less than six months." He testified that, "[i]f that disturbance goes beyond six months then it becomes schizophrenia, and both of those conditions I diagnosed."

Middlebrooks's mother and father testified about their daughter's mental breakdown in 2012, which resulted in the second hospitalization at the VA Hospital in Augusta. They found Middlebrooks walking aimlessly down the middle of a busy street, and she could not answer where she was going. When her father was driving her home, she tried to jump out of his truck. She told her father that he was the devil or "something evil" and screamed "don't kill me." Middlebrooks's father testified that, after Middlebrooks returned from combat service in Iraq, she had changed – her face was "blank," she "start[ed] forgetting things," her "patience [was] shot," and, when he looked in her eyes, "something was missing, something was gone." Middlebrooks sometimes told her mother that she was hearing voices. In the weeks before Sky's death, Middlebrooks's mother thought that Middlebrooks seemed withdrawn and that something was wrong with her. Middlebrooks's

14

sister and brother-in-law testified, describing several incidents of Middlebrooks's "belligerent" and bizarre behavior in the years between her return from Iraq in 2006 and Sky's death in 2013, including having loud arguments with herself and accusing strangers of "talking bad about her and looking at her funny." In early 2013, Middlebrooks told her sister that VA doctors diagnosed her with schizophrenia. Middlebrooks did not testify.

The State presented the testimony of Middlebrooks's cellmate at the Columbia County jail in November 2014, Kala Stewart, as to statements Middlebrooks made while awaiting trial. Stewart testified that Middlebrooks told her that "she killed her child before she left the house, her driveway," and "she did it out of spite of her boyfriend." Stewart testified that Middlebrooks told her that "her lawyer was going for mental illness" as a defense, but Middlebrooks told Stewart that "she [was not] mentally ill." Middlebrooks told Stewart that she did not think her case was going well.

In addition, the State presented expert testimony to rebut the testimony of Middlebrooks's expert witnesses that they found no

evidence of malingering, either in Middlebrooks's past mental health records or in their own evaluations. Dr. Michael Vitacco, after being qualified as an expert in forensic psychology, testified that he evaluated Middlebrooks at the East Central Regional Hospital, where he serves as a licensed clinical psychologist, over the course of 40 days in June and July 2013, beginning seven weeks after Sky's death. In addition to formally interviewing Middlebrooks three times and giving her psychological tests, meetings lasting a total of 3 hours and 20 minutes, Dr. Vitacco spoke with her briefly approximately 20 times over her 40-day stay. He also communicated with her treating psychiatrist and other caregivers who interacted with Middlebrooks for extended periods daily. After Middlebrooks returned to the jail, he and a colleague prepared a Criminal Responsibility Evaluation report and a Competency to Stand Trial Evaluation report.

In Dr. Vitacco's opinion, other practitioners' diagnosis of schizophrenia was not supported by the evidence, one reason being that the records showed that Middlebrooks's symptoms improved

16

during each hospitalization much more quickly than would typically happen in cases of acute schizophrenia. Dr. Vitacco testified that, during interviews with him, Middlebrooks reported hearing voices and behaved consistently with that symptom, but she would behave "quite differently," appearing to be unaffected by hallucinations, when she was "away from the people who were interviewing her." Dr. Vitacco noted that, according to Middlebrooks's mental health records, she reported paranoid delusions that "people were out to get her," but "at no point" before she killed Sky "did she endorse a delusion consistent with killing her child." He also found it significant that Middlebrooks never reported any religious delusions until after she killed Sky and was being evaluated for criminal responsibility, at which point she reported a religious delusion that she was on a mission from God to help Sky go to heaven. Dr. Vitacco testified that Middlebrooks's description of the events "changed dramatically" and evolved from telling first responders that she had no recollection of the entire event, to telling detectives that nothing happened and Sky was still alive, and then, "[f]ast forward just eight

weeks and she had a perfect recollection, once she arrived at the hospital, of everything that happened in that car, including being able to describe the last minutes of her daughter's life." Dr. Vitacco believed that, after being given the Structured Interview of Reported Symptoms test, Middlebrooks falsely reported a version of some of the specific hallucinations that were questions on the test. He testified that she reported "a slew of new symptoms" after she killed Sky, "each one self-serving to justify the death of her daughter[,]" but she did not display the behavioral "signs" of someone experiencing the reported symptoms. Staff members saw Middlebrooks "greeting [other patients] warmly" and laughing with them – she was even "voted vice-president of [her] unit because her peers liked her so much" – and she followed hospital rules and behaved appropriately in classes and group sessions. Dr. Vitacco testified that, "on several occasions[,]" after a class or group, Middlebrooks "would approach the group leader" and ask "specific questions about the insanity defense" and "how . . . one go[es] about it." During the last week of her 40-day stay at the hospital,

18

Middlebrooks told her treating psychiatrist that she was "feeling hopeful . . . about the possibility of building an NGRI case."

Dr. Vitacco defined malingering as "the intentional production of symptoms in order to basically get out of something," such as, in the criminal justice context, "to get out of going to prison or going to trial." After reviewing evidence about Middlebrooks's behavior in the few days surrounding Sky's death, including a videotaped police interview, reviewing the VA records, personally interviewing and observing Middlebrooks, and administering tests designed, in part, to detect malingering, Dr. Vitacco concluded that Middlebrooks was "retrospectively malingering," that is, feigning having had symptoms at the time of Sky's death in order to avoid criminal responsibility for the death of her daughter.

Based on the totality of the evidence Dr. Vitacco reviewed, his professional opinion was that, "when [Middlebrooks] killed her daughter[,]" she "was not mentally ill[;]" specifically, she was not "psychotic" or suffering from "schizophrenia[,]" which is a "thought disorder." Dr. Vitacco testified that Middlebrooks was diagnosed,

during her hospitalization at East Central Regional Hospital, with post-traumatic stress disorder and with "a series of personality disorders[,]" which are "maladaptive traits" that are "not considered . . . disorder[s] of thought or mood that substantially impair[ ] one's judgment, one's behavior, one's ability to recognize reality[.]" In terms of personality disorders, Dr. Vitacco testified that Middlebrooks was diagnosed with "borderline personality disorder" and "adjustment disorder." Despite these diagnoses, in Dr. Vitacco's expert opinion, when Middlebrooks killed her daughter, "she was very aware of right from wrong" and "was very aware that murder was against the law, both morally wrong and legally wrong." He testified that he did not believe that Middlebrooks "was experiencing a delusional compulsion that overmastered her will" at the time of the crime and that, even if he did believe her, the nature of the delusion she reported would not have justified the act of killing her daughter. In Dr. Vitacco's opinion, Middlebrooks was simply "angry and she took it out on her two-year-old child." Asked if he had "any personal stake in the outcome of this case," Dr. Vitacco replied that

20

he had no personal stake in the case and described himself as "a state employee and a psychologist" who was not "paid by the prosecution or the defense" and was "simply a [j]udge's witness."

At the end of Dr. Vitacco's direct testimony, the prosecutor asked him "what happens when a person is found not guilty by reason of insanity?" Defense counsel did not object before Dr. Vitacco responded that the person "would come to our hospital for a period of 30 days. And then we would evaluate that individual . . . to determine if they were mentally ill . . . and dangerous to themselves or others. And then we would have a hearing in 30 days to determine if they could be released[, as required by] state law[.]" The prosecutor asked, "[b]y law, if that person is not a danger to themself or others and is not suffering from a mental illness, what is the [c]ourt obligated to do?" Dr. Vitacco answered, "[A]ccording to the Supreme Court[, the trial court would] be obligated to release that individual." Middlebrooks's counsel objected to "this man giving a legal opinion" and moved to strike the testimony, arguing that "Georgia law tells us what the law is. [Such a person does not] get

21

out until you say they get out. . . . [T]he [j]udge gives the law . . . not the State's witness." The trial court overruled the objection and declined to strike the testimony.

1. Middlebrooks contends that the trial court abused its discretion in overruling her objection to Dr. Vitacco's testimony about what happens after a jury finds a criminal defendant not guilty by reason of insanity and in denying her motion to strike the testimony. She contends that the testimony constituted improper legal opinion testimony and that the law should have come only from the judge. In addition, Middlebrooks argues that Dr. Vitacco's testimony paraphrased parts of OCGA § 17-7-131, pertaining to evaluation and commitment following a verdict of not guilty by reason of insanity, information that should not have been conveyed to the jury, and that his paraphrase was incomplete and misleading.

Middlebrooks argues that Dr. Vitacco's reference to those aspects of the law was especially harmful because he described himself as the "[j]udge's witness" and because he implied that he personally would be evaluating her after verdict. Because Dr.

22

Vitacco had testified that he had already found that Middlebrooks was merely malingering and not mentally ill, Middlebrooks contends that the testimony improperly encouraged the jury to believe that, if the jury returned a verdict of not guilty by reason of insanity, the trial court would have no choice but to release her immediately after a 30-day post-trial evaluation. And she argues that the trial court's instruction about the consequences of a verdict of not guilty by reason of insanity did not correct and override Dr. Vitacco's misleading paraphrase of OCGA § 17-7-131, because the court's instruction did not directly contradict Dr. Vitacco's statement and could be understood by the jury as complementary with that testimony. She also argues that the trial court's instruction that the jury is not to concern itself with punishment did not alleviate the harm caused by the statement because commitment after a not guilty by reason of insanity verdict is not in the nature of punishment and therefore the instruction about the jury not concerning itself with punishment did not apply.

When an accused pleads not guilty by reason of insanity at the

23

time of the crime, the Criminal Procedure Code requires the trial court to instruct the jury in specific and limited terms regarding the consequences of each potential verdict.[5] See OCGA § 17-7-131 (b) (3). One of these instructions is that, "should you find the defendant not guilty by reason of insanity at the time of the crime, the defendant

---

[5] OCGA § 17-7-131 (c) provides in pertinent part:

> In all criminal trials in any of the courts of this state wherein an accused shall contend that he or she was insane, mentally ill, or intellectually disabled at the time the act or acts charged against him or her were committed, the trial judge shall instruct the jury that they may consider, in addition to verdicts of "guilty" and "not guilty," the additional verdicts of "not guilty by reason of insanity at the time of the crime," "guilty but mentally ill at the time of the crime," and "guilty but with intellectual disability."

See *Foster v. State*, 283 Ga. 47, 49 (2) (656 SE2d 838) (2008) ("When a defense of insanity has been interposed, OCGA § 17-7-131 (c) requires that the jury be instructed to consider all five verdict options set forth therein. The failure to charge on all five options is harmless error if there is no evidence to support the verdict option or options omitted."); see also *Durrence v. State*, 287 Ga. 213, 216 n.4 (695 SE2d 227) (2010) (Recognizing the clear legal distinctions between being insane at the time of the crime and being mentally ill or mentally retarded, which was the fifth verdict option at the time, each of which requires different forms of proof, "and their correlating similarities, OCGA § 17-7-131 (c) requires that the jury be instructed to consider all five verdict options set forth therein when a defense of insanity is raised."). In this case, there was no evidence of any mental retardation or intellectual disability, and neither the trial court's jury charge nor the verdict form included the verdict option of "guilty but mentally retarded." Although OCGA § 17-7-131 (c) requires that the jury be instructed to consider all five verdict options set forth in the statute, Middlebrooks does not claim that it was error to omit the fifth option in her case.

will be committed to a state mental health facility until such time,

if ever, that the court is satisfied that he or she should be released

pursuant to law." OCGA § 17-7-131 (b) (3) (A).[6] See *Foster v. State*,

306 Ga. 587, 590-592 (2) (a) (832 SE2d 346) (2019).

> This Court has explained that the jury instructions
> required by OCGA § 17-7-131 (b) (3) create a limited
> exception to the general rule proscribing consideration of

---

[6] In full, OCGA § 17-7-131 (b) (3) provides:

(3) In all cases in which the defense of insanity, mental illness, or intellectual disability is interposed, the trial judge shall charge the jury, in addition to other appropriate charges, the following:

(A) I charge you that should you find the defendant not guilty by reason of insanity at the time of the crime, the defendant will be committed to a state mental health facility until such time, if ever, that the court is satisfied that he or she should be released pursuant to law.

(B) I charge you that should you find the defendant guilty but mentally ill at the time of the crime, the defendant will be placed in the custody of the Department of Corrections which will have responsibility for the evaluation and treatment of the mental health needs of the defendant, which may include, at the discretion of the Department of Corrections, referral for temporary hospitalization at a facility operated by the Department of Behavioral Health and Developmental Disabilities.

(C) I charge you that should you find the defendant guilty but with intellectual disability, the defendant will be placed in the custody of the Department of Corrections, which will have responsibility for the evaluation and treatment of the mental health needs of the defendant, which may include, at the discretion of the Department of Corrections, referral for temporary hospitalization at a facility operated by the Department of Behavioral Health and Developmental Disabilities.

the consequences of a guilty verdict. This exception protects the defendant's right to an impartial verdict by correcting any misconceptions jurors may have that a verdict of not guilty by reason of insanity, guilty but mentally ill, or guilty but with intellectual disability would result in the defendant's immediate release (as does a verdict of not guilty). . . . Once the jury understands the nature of these particular verdicts, it can focus solely on the mental condition of the defendant and decide that issue free from concerns about whether and how the defendant might be punished.

Id. at 593 (2) (b) (citation and punctuation omitted).

In this case, Dr. Vitacco introduced aspects of the consequences of a verdict of not guilty by reason of insanity that appear in parts of OCGA § 17-7-131 and the statutory criteria for involuntary civil commitment[7] that are not pertinent to the issues to be decided by

---

[7] OCGA § 17-7-131 (d) provides:
Whenever a defendant is found not guilty by reason of insanity at the time of the crime, the court shall retain jurisdiction over the person so acquitted and shall order such person to be detained in a state mental health facility, to be selected by the Department of Behavioral Health and Developmental Disabilities, for a period not to exceed 30 days from the date of the acquittal order, for evaluation of the defendant's present mental condition. Upon completion of the evaluation, the proper officials of the mental health facility shall send a report of the defendant's present mental condition to the trial judge, the prosecuting attorney, and the defendant's attorney, if any.
OCGA § 17-7-131 (e) (1) provides:

the jury. See OCGA § 17-7-131 (b) (1). And he did so in a way that could have been misleading. Specifically, Dr. Vitacco referred to an evaluation at "our hospital," while the statute provides that a person found not guilty of a crime by reason of insanity would be detained at a state mental health facility chosen by the Department of Behavioral Health and Developmental Disabilities. See OCGA § 17-7-131 (d). More importantly, his statement that, after 30 days'

---

After the expiration of the 30 days' evaluation period in the state mental health facility, if the evaluation report from the Department of Behavioral Health and Developmental Disabilities indicates that the defendant does not meet the inpatient commitment criteria of Chapter 3 of Title 37 or Chapter 4 of Title 37, the trial judge may issue an order discharging the defendant from custody without a hearing.

After a verdict of not guilty by reason of insanity, the trial judge determines under specified procedures whether the defendant meets the statutory inpatient-commitment criteria. See OCGA §§ 37-3-1 (9.1) ("'Inpatient' means a person who is mentally ill and . . . [w]ho presents a substantial risk of imminent harm to that person or others, as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to that person or other persons . . . and . . . [w]ho is in need of involuntary inpatient treatment."); 37-3-83 (g) (If, after a specified process, the designated medical officer determines that an involuntarily hospitalized person "is not a person who has mental illness requiring involuntary treatment, the person shall be immediately discharged from involuntary hospitalization[.]"); 37-3-85 (providing for regular review of service plans for patients receiving involuntary inpatient treatment and for modification of plans, including by discharge, as medically appropriate).

27

evaluation, "we would have a hearing" to determine whether the person was legally entitled to be released obscured the fact that the trial court would "retain jurisdiction" over Middlebrooks, OCGA § 17-7-131 (d),[8] and that she could only be discharged from involuntary commitment by order of the trial court in accordance with procedures specified in the Code section. See OCGA § 17-7-131 (f).[9]

---

[8] See also OCGA § 17-7-131 (e) (4) (If, after the 30-day evaluation of the defendant's mental condition and a hearing, if ordered, under OCGA § 17-7-131 (d), "the judge determines that the defendant meets the [statutory] inpatient commitment criteria . . . , the judge shall order the defendant to be committed to the Department of Behavioral Health and Developmental Disabilities to receive involuntary treatment . . . or to receive services" under the Mental Health Code.).

[9] OCGA § 17-7-131 (f) provides:

A defendant who has been found not guilty by reason of insanity at the time of the crime and is ordered committed to the Department of Behavioral Health and Developmental Disabilities under subsection (e) of this Code section may only be discharged from that commitment by order of the committing court in accordance with the procedures specified in this subsection:

(1) Application for the release of a defendant who has been committed to the Department of Behavioral Health and Developmental Disabilities under subsection (e) of this Code section upon the ground that he does not meet the civil commitment criteria under Chapter 3 of Title 37 or Chapter 4 of Title 37 may be made to the committing court, either by such defendant or by the superintendent of the state hospital in which the said defendant is detained;

(2) The burden of proof in such release hearing shall be upon

Closing arguments were not transcribed, and we cannot discern whether either side's argument clarified Dr. Vitacco's response to the question.[10] By the same token, we cannot assume that the prosecutor's argument amplified the implication that within a short period the trial court might be obligated to order that Middlebrooks be released. In the trial court's final charge to the jury, the court instructed the jury as required by OCGA § 17-7-131 (b) (3) regarding the consequences of each of the possible verdicts, including that, if the jury should find Middlebrooks not guilty by reason of insanity, she would be committed until such time, if ever,

the applicant. The defendant shall have the same rights in the release hearing as set forth in subsection (e) of this Code section; and

(3) If the finding of the court is adverse to release in such hearing held pursuant to this subsection on the grounds that such defendant does meet the inpatient civil commitment criteria, a further release application by the defendant shall not be heard by the court until 12 months have elapsed from the date of the hearing upon the last preceding application. The Department of Behavioral Health and Developmental Disabilities shall have the independent right to request a release hearing once every 12 months.

[10] At the hearing on Middlebrooks's motion for a new trial, her appellate counsel asked her trial counsel, "During the closing argument did you discuss the effect of a not guilty by reason of insanity verdict?" Her trial counsel did not answer "yes" or "no" but only stated that he did not remember everything he said in closing argument.

the court was satisfied that she should be released pursuant to law. The trial court's jury charge did not address the 30-day evaluation procedure under OCGA § 17-7-131 (d) and the statutory criteria for involuntary civil commitment that Dr. Vitacco referenced.

We can see that Dr. Vitacco's testimony about the consequences of a verdict of not guilty by reason of insanity, if credited by jurors as a correct statement of applicable law, could have reinforced, rather than corrected, any misconceptions jurors may have had that only a guilty verdict would prevent Middlebrooks's nearly immediate release. If taken in this light, Dr. Vitacco's testimony undermined an essential purpose of OCGA § 17-7-131. See *Foster*, 306 Ga. at 593 (2) (b). Given the narrow focus of the statutorily prescribed jury instructions, the State should not have elicited such extraneous testimony. Assuming the trial court erred in allowing the testimony to stand, we must consider whether the error was harmless to determine if a new trial is warranted. See *Jones v. State*, 315 Ga. 117, 123 (4) (880 SE2d 509) (2022) ("Erroneous evidentiary rulings are subject to a harmless-error

test."). The harmless-error test applicable in this case is that for nonconstitutional error.

> A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury. In determining whether the error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict.

Id. (citations and punctuation omitted); *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976) (discussing and adopting the highly-probable test for nonconstitutional errors).[11]

Middlebrooks's burden in asserting the insanity defense was to prove by a preponderance of the evidence that she was mentally

---

[11] To compare the test that governs the determination of harmlessness when an evidentiary ruling amounts to constitutional error, see *Moore v. State*, 315 Ga, 263, 271 (3) (b) (882 SE2d 227) (2022) ("A constitutional error is harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming." (citation and punctuation omitted)); see also *Hill v. State*, 310 Ga. 180, 188 (6) (850 SE2d 110) (2020) (alleged violation of the privilege against unreasonable searches); *Ensslin v. State*, 308 Ga. 462, 473 (2) (d) (841 SE2d 676) (2020) (alleged violation of the privilege against self-incrimination); *McCord v. State*, 305 Ga. 318, 321 (2) (a) (825 SE2d 122) (2019) (alleged violation of the right to confront witnesses).

incapable of distinguishing between right and wrong regarding the particular acts charged. See *Bowman v. State*, 306 Ga. 97, 100 (1) (c) (829 SE2d 139) (2019). As recounted above, opinion evidence given by Drs. McKee and Schartz-Watts supported a finding that Middlebrooks's mental illness of acute schizophrenia with delusions rendered her incapable of distinguishing between right and wrong with regard to killing Sky. On the other hand, Dr. Vitacco's opinion evidence supported the contrary finding that Middlebrooks was mentally capable of distinguishing between right and wrong regarding the act of fatally stabbing her daughter. His testimony included detailed descriptions of the distinctions between disorders of thought – disorders, such as schizophrenia, that may rob a person of the mental capacity to distinguish right from wrong at the time of a criminal offense – and other mental health conditions that do not typically have that effect. Dr. Vitacco's expert opinion that Middlebrooks did not have a mentally incapacitating thought disorder when she fatally stabbed Sky was based in part on his personal observation that Middlebrooks's behavior was often

32

inconsistent with the symptoms she reported. In addition, he testified that he learned from hospital staff members that Middlebrooks actively sought information about how to "go about" and "build" an insanity defense. The evidence that Dr. Vitacco formed his opinions after interacting with and observing Middlebrooks much closer in time to the crimes and on many more occasions than had Drs. McKee and Schwartz-Watts is a factor in assessing the weight of Dr. Vitacco's expert opinion that Middlebrooks was faking mental illness to avoid criminal responsibility for killing her daughter. Another factor is evidence, introduced through the testimony of Middlebrooks's cellmate, that Middlebrooks denied being mentally ill, despite her lawyer's plan to present a mental illness defense, and admitted that she killed her daughter out of spite.

The State's burden under the applicable harmless-error test – showing that "it is highly probable that the error did not contribute to the verdict" – is a heavy one. Even so, to overturn the jury's verdicts on the basis of Dr. Vitacco's improper testimony, there must

be more than a theoretical possibility that the error contributed to the verdicts. In assessing nonconstitutional error, we do not look to a single aspect of Dr. Vitacco's testimony, divorced from the context of the entire trial. We consider all of the evidence, and we weigh the evidence as we would expect reasonable jurors to have done. See *Jones*, 315 Ga. at 122 (4).[12] Having reviewed all of the evidence de novo and weighed it as we would expect reasonable jurors to have done, we conclude that it is highly likely that Dr. Vitacco's brief testimony about the general consequences of a verdict of not guilty by reason of insanity was not an important factor for the jury compared to the substantial evidence that Middlebrooks had the mental capacity to distinguish right from wrong in killing Sky. Because it is highly probable that the trial court's ruling on Middlebrooks's objection and motion to strike the testimony did not contribute to the verdict, a new trial is not warranted. See *Brookins*

---

[12] See also *Johnson*, 238 Ga. at 61 (Even an error that is "relevant to the issues in dispute, not cumulative of other evidence, not beneficial to the defendant[,] and uncorrected by the trial court . . . may nevertheless be harmless in the context of the entire case.").

*v. State*, 315 Ga. 86, 99 (5) (879 SE2d 466) (2022).

2. (a) Middlebrooks contends that "the trial court erred in restricting" Dr. Evans's testimony to non-expert matters "without following the correct procedure" under federal regulations concerning the testimony of VA personnel in legal proceedings.[13] This claim fails because Middlebrooks failed to preserve any error in this regard for ordinary appellate review and she failed to show plain error.

The record shows that, at the beginning of Middlebrooks's presentation of evidence, an assistant United States Attorney accompanied Dr. Evans to court and advised the trial court that federal law required approval from the federal government anytime

---

[13] See 38 CFR §§ 14.800 through 14.810, establishing policy, assigning responsibilities, and prescribing procedures with respect to the testimony of VA personnel and production of department records in federal, state or other legal proceedings. Section 14.808 (a) provides in relevant part: "VA personnel shall not provide, with or without compensation, opinion or expert testimony in any legal proceedings concerning official VA information, subjects or activities, except on behalf of the United States or a party represented by the United States Department of Justice[,]" absent official authorization by the responsible VA official. Section 14.804 sets out the types of factors VA personnel responsible for making the decision whether to authorize the disclosure of VA records or information or the testimony of VA personnel should consider.

a federal employee is called as a witness in state court. The federal attorney reported that, after defense counsel requested that Dr. Evans testify, the VA Office of General Counsel authorized him to testify within boundaries, specifically that Dr. Evans could testify about his personal observations of Middlebrooks, about conversations he had with her, and about the contents of her medical records, but he could not serve as an expert witness or answer hypothetical questions. The prosecutor then argued that, "if [Dr. Evans] can't testify as an expert witness[,] then he can't render an opinion as to his diagnosis [of Middlebrooks] back in 2011 and 2012." Initially, the prosecutor framed an objection based on relevance, asserting, if Dr. Evans could not give expert opinion testimony, then *none* of his testimony would be relevant. Defense counsel stated that he would not be asking for "a present diagnosis," but for "a historical diagnosis," and argued that such testimony would not constitute expert testimony.

In the ensuing colloquy among the trial court and counsel, the court asked if defense counsel had any legal authority "that

support[ed] what [the defense] wanted to go into [during his examination of Dr. Evans] based on the restrictions that have been placed on [his] testimony." Defense counsel responded that he intended to ask Dr. Evans about "the nature of [Middlebrooks's] hospitalization[,] . . . why she was in the hospital[,] . . . how long she was in the hospital, and whether or not she was confined in the hospital." After a recess, defense counsel, "in an effort to compromise this issue[,] . . . agree[d] not to ask [Dr. Evans] about his diagnosis" of Middlebrooks. Defense counsel described Dr. Evans as an "essential" witness, because he had been Middlebrooks's caretaker in the VA mental hospital twice in the years before this crime occurred[,]" and argued that if he was prohibited from testifying Middlebrooks would be "deprived of the right of compulsory process and [her] constitutional rights under both the State and Federal constitution[s], [her] Sixth Amendment rights." Softening the State's earlier position, the prosecutor stated, "I'm not objecting to him testifying." The trial judge stated, "I'm not going to . . . prohibit him from testifying, but based on restrictions that are in place it

37

does not appear that he can render a diagnosis." Defense counsel responded, "I understand." The prosecutor advised that he would object "based on [a lack of] foundation" to any question "that call[ed] for an opinion[,] . . . including the diagnosis[,]" because such an opinion could only "be rendered by an expert[.]" Defense counsel responded, "[w]e can handle that," the court summoned the jury, and Dr. Evans took the stand.

Assuming without deciding that the trial court affirmatively ruled that Dr. Evans was prohibited from "render[ing] a diagnosis," the record establishes that the defense ultimately withdrew any challenge to such ruling. Without preservation of error as provided in OCGA § 24-1-103, we review an evidentiary ruling only for plain error pursuant to OCGA § 24-1-103 (d). See *Ellington v. State*, 314 Ga. 335, 343 (3) (877 SE2d 221) (2022); *Lofton v. State*, 309 Ga. 349, 358 (4) (846 SE2d 57) (2020); *Martin v. State*, 306 Ga. 747, 749 (2) (833 SE2d 122) (2019). To establish plain error, Middlebrooks "must point to an error that was not affirmatively waived," and that "error must have been clear and not open to reasonable dispute, must have

affected [her] substantial rights, and must have seriously affected the fairness, integrity or public reputation of judicial proceedings." *Ellington*, 314 Ga. at 343 (3) (citation, punctuation, and footnote omitted).

"For purposes of plain error review, an affirmative waiver is the intentional relinquishment or abandonment of a known right." *Griffin v. State*, 309 Ga. 860, 865 (2) (849 SE2d 191) (2020) (citation and punctuation omitted). The record shows that the defense invoked known rights, then proposed a resolution to the parties' evidentiary dispute that involved voluntarily curtailing Middlebrooks's assertion of those rights. The transcript of the colloquy before Dr. Evans testified shows that defense counsel opted to proceed with Dr. Evans's testimony, with the latitude to question him, without drawing an objection by the State, about the facts of Middlebrooks's hospitalizations with the sole limitation that he could not elicit testimony that Dr. Evans had diagnosed Middlebrooks with schizophrenia – an opinion that was reflected in the medical records and referenced in the testimony of

Middlebrooks's two expert witnesses. In addition, at the hearing on Middlebrooks's motion for a new trial, her trial counsel testified that he had previous experience with "forcing an expert witness who did not want to appear" as an expert to testify, that witness "made [him] 'wish'" he had not compelled the witness to testify, and he "didn't want to have that situation with Dr. Evans." Thus, Middlebrooks intentionally relinquished any claim that the trial court erred in limiting the scope of Dr. Evans's testimony, and this claim of error fails at the first stage of plain-error review. See *Washington v. State*, 312 Ga. 495, 499 (1) (863 SE2d 109) (2021); *Griffin*, 309 Ga. at 864-866 (2); see also *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018) ("We need not analyze all of the elements of [the plain-error] test when, as in this case, the defendant has failed to establish one of them.").

(b) In a related claim of error, Middlebrooks contends that her "trial counsel was ineffective in failing to object to the limitation of Dr. Evan[s]'s testimony by the [f]ederal government and the [p]rosecutor." Specifically, she criticizes her counsel's conduct in

"ultimately consent[ing] to limiting his questions of Dr. Evans." In addition, Middlebrooks avers that her "[t]rial counsel expressed ignorance of the federal rule governing VA testimony," and she argues that, "[h]ad he consulted the regulation governing expert testimony of VA witnesses, he would have seen the procedure that needed to be followed by either himself or the [c]ourt." In another section of her brief, Middlebrooks avers that defense counsel did not "request the Department of Veterans Affairs to allow Dr. Evans to testify as an expert. This is even though the factors listed in [the applicable federal regulation] would have likely been met." She contends that "the diagnosis of her mental illness was hampered by the exclusion of her primary diagnosing physician" and that, as a result, "[t]he accusation of recent fabrication was left hanging over the trial." Middlebrooks contends that "[t]he error of trial counsel was so prejudicial that it most likely changed the outcome of the trial." To prevail on a claim of ineffective assistance of counsel, the appellant "must show that his lawyer's performance was constitutionally deficient and that he suffered prejudice as a result."

41

*Clark v. State*, ___ Ga. ___, ___ (5) (Case No. S22A0950, decided Jan. 18, 2023). See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). If the appellant "fails to prove one element of this test, we need not address the other element." *Mahdi v. State*, 312 Ga. 466, 468 (2) (863 SE2d 133) (2021) (citation and punctuation omitted).

First, Middlebrooks's claims that her counsel failed to seek permission from the VA to allow Dr. Evans to testify as an expert and that he expressed ignorance at trial of the federal rule governing VA testimony are belied by the record. The representative of the VA informed the trial court that, in advance of the trial, Middlebrooks's counsel requested approval from the VA for Dr. Evans to testify and that the VA authorized him to testify within boundaries the VA set. The record shows at most that counsel was caught off guard by the prosecutor's initial, later-abandoned objection to Dr. Evans's testifying at all if he was not permitted to testify as to his

diagnoses.[14]

As to counsel's agreement not to ask Dr. Evans about his diagnoses, we consider the second prong of *Strickland* first. To show prejudice, the appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). Although defense counsel failed to object to the limitations placed on Dr. Evans's testimony, counsel presented two expert witnesses, who testified about her diagnoses, the severity of her symptoms, and her mental illness's effect on her ability to distinguish right from wrong when she killed Sky. Middlebrooks's stated need for Dr. Evans's testimony

---

[14] In objecting on the basis of relevancy to Dr. Evans being allowed to testify that he had diagnosed Middlebrooks with schizophrenia in 2011 and 2012, the prosecutor argued that, "if he's not [qualified as] an expert [at trial,] he can't testify as to a diagnosis [he made in the past], which is the only reason [the defense is] calling him. . . . If he's not an expert[,] his testimony is meaningless." Defense counsel responded that "[e]ven lay witnesses can testify just based upon their observations." The trial court asked both sides, "do y'all have any case law that supports your position?" Defense counsel responded, "I never heard of such an objection so I do not have case law."

was to show that the same mental illness manifested many months before the crimes, with sufficiently severe symptoms to warrant extended involuntary hospitalizations, to counteract the State's evidence that she was only feigning insanity after the homicide to avoid criminal liability for Sky's death. The record shows that Middlebrooks was able to elicit such testimony from Dr. Evans, even without asking him to give opinion testimony about his diagnoses, and to connect her experts' later diagnoses to Middlebrooks's preexisting history of mental illness.[15] In addition, Dr. McKee, one of Middlebrooks's expert witnesses, testified extensively about the

---

[15] At the hearing on Middlebrooks's motion for a new trial, her trial counsel testified:

> It was important for me to show this insanity plea was not something that a lawyer made up at the last minute. I wanted to get into her history. I wanted to show why she was in the hospital, how long she was in the hospital, and what kind of treatment she had in the hospital, and what that treatment was generally for. That way I was able to satisfy the VA who did not want [Dr. Evans] to testify as an expert. But I got in all I wanted by showing that he has treated her and she had been diagnosed as psychotic[,] . . . and she was so dangerous that she had to stay in the hospital for . . . a number of weeks. . . . [Dr. Evans's diagnosis] was not [a key to the defense]. . . . I just wanted to get that she was admitted in the hospital because she was schizophrenic, and I was able to get that in. And she was confined because she was schizophrenic, and I was able to get that in. And she was confined for a good period of time, and I was able to get that in without a diagnosis from Dr. Evans.

records he reviewed of Middlebrooks's 2011 and 2012 hospitalizations, including her reported delusions and the diagnoses by VA physicians, including Dr. Evans. Given that defense counsel was able to elicit the desired evidence, Middlebrooks has not shown a reasonable probability that, but for defense counsel's allegedly deficient performance with regard to accepting the limitations on Dr. Evans's testimony, the outcome of the trial would have been different. Accordingly, this claim of error fails. See *Hornbuckle v. State*, 300 Ga. 750, 758 (6) (c) (797 SE2d 113) (2017).[16]

*Judgment affirmed. All the Justices concur.*

---

[16] Under Georgia law, where alleged errors by the trial court and deficient performance by defense counsel involve evidentiary issues, courts consider collectively the prejudicial effect of those errors in considering whether a criminal defendant is entitled to a new trial. See *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020). For purposes of a cumulative-error analysis in this case, the assumed trial court evidentiary error is the admission of Dr. Vitacco's testimony about some of the consequences of a verdict of not guilty by reason of insanity, which we have already determined to be harmless, and the assumed deficient performance of counsel is failing to object to the limitation of Dr. Evans's testimony, which we have already determined did not prejudice Middlebrooks. We have considered the cumulative effect of this presumed evidentiary error and presumed deficient performance of counsel together and conclude that their collective effect is not sufficiently harmful to outweigh the strength of the properly admitted evidence of Middlebrooks's guilt so as to warrant a new trial. See *Perkins v. State*, 313 Ga. 885, 904 n.22 (5) (b) (873 SE2d 185) (2022).