

SUPREME COURT OF GEORGIA

November 2, 2022

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

Upon consideration, the Court has revised the deadline for motions for reconsideration in this matter. It is ordered that a motion for reconsideration, if any, including motions submitted via the Court's electronic filing system, must be **received in the Clerk's Office by 2 p.m. on Wednesday, November 9, 2022**.

SUPREME COURT OF THE STATE OF GEORGIA
Clerk's Office, Atlanta

  I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
  Witness my signature and the seal of said court hereto affixed the day and year last above written.

_____, Clerk

NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 2, 2022

S22A0425.  JONES v. THE STATE.

BOGGS, Chief Justice.

Appellant Deon Jones challenges his convictions for felony murder and influencing a witness in connection with the shooting death of Scott Corwin.[1] He contends that the statute of limitation barred his prosecution for influencing a witness; that the trial court made several erroneous evidentiary rulings; that he was denied

---

[1] The crimes occurred on May 29 and 31, 2004. On December 27, 2017, a Chatham County grand jury indicted Appellant for malice murder, felony murder based on aggravated assault, felony murder based on possession of a firearm by a convicted felon, felony murder based on attempted armed robbery, and influencing a witness. At a trial from April 16 to 23, 2018, the jury acquitted Appellant of malice murder but found him guilty of the remaining charges. The trial court sentenced Appellant to serve life in prison for one count of felony murder and ten years consecutive for influencing a witness; the other felony murder convictions were vacated by operation of law. On April 24, 2018, Appellant filed a motion for new trial, which he amended on June 12, 2019, and October 22, 2020. After an evidentiary hearing on July 6, 2021, the court denied the motion on September 20, 2021. Appellant then filed a timely notice of appeal. The case was docketed in this Court to the April 2022 term and submitted for a decision on the briefs.

1

effective assistance of counsel; and that the combined effect of the trial court's multiple erroneous evidentiary rulings and his trial counsel's deficient performance deprived him of a fair trial. For the reasons that follow, we reverse Appellant's conviction and sentence for influencing a witness, but we otherwise affirm the trial court's judgment.

1. Sometime in May 2004, Appellant, a convicted felon, bought on credit a stolen .38-caliber revolver from 16-year-old Kelly Bigham. In the early morning hours of May 29, Bigham drove Appellant to the Monterey Square area of downtown Savannah, looking for someone to rob. Scott Corwin was walking with his girlfriend, Mindy Davis, and Appellant attempted to rob him. When Corwin resisted, Appellant shot Corwin through the chest before fleeing the scene. Corwin later died from the gunshot wound at a nearby hospital.

Late on the night of May 31, 2004, Bigham asked Appellant for the money he owed her for the gun. Appellant said that he would go get some money, borrowed a car, and had Bigham drive him

2

downtown. Along the way, Appellant pulled out his gun and threatened to kill Bigham if she told anyone that he had killed Corwin, and Bigham noticed that Appellant had a fresh tattoo of a teardrop by his eye. Bigham took the teardrop to mean that Appellant had killed someone, although she thought the tattoo could also represent that Appellant had spent time in prison. Shortly before 2:00 a.m. on June 1, approximately one block from where Appellant shot Corwin, Appellant shot Charles Buskirk once from behind during another attempted robbery. Buskirk was on his front porch when he was shot, returning inside his home after investigating a noise that startled his cat. Buskirk called 911, and at the hospital, doctors removed a .38-caliber bullet from his small intestine.

Within the next few weeks, Novell Bryant, a confidential informant for the FBI, relayed to his handler a recent conversation that he had with Appellant. According to Bryant, Appellant said that he and Bigham went to downtown Savannah, where Appellant used a .38-caliber revolver that he got from Bigham to shoot and kill

a man during a robbery. On June 18, law enforcement officers searched Appellant's residence, where they found a box of .38-caliber bullets that were similar to the bullet removed from Buskirk. On June 22, Bryant reported that Appellant had given the gun to a "partner" and provided the police with a phone number that the police traced to a cellphone used by Walter Moon, a convicted felon. The next day, a detective interviewed Bigham, who confirmed she had been with Appellant when he shot someone during a robbery in downtown Savannah.

Appellant then was tried in federal court for possession of bullets and a firearm as a convicted felon in connection with Buskirk's shooting. During that trial, a boyfriend of Appellant's sister wore to court a t-shirt bearing the words "he was a snitch" and depicting a murder scene surrounded by crime-scene tape; the boyfriend was ordered to change his shirt, but not before he had driven one of the witnesses to court and sat next to him in court that morning. Nonetheless, Appellant was convicted on all counts. Appellant was never otherwise prosecuted for Buskirk's shooting.

4

The Corwin murder case also went cold at that point, but the record does not reveal why.

Years later, when Appellant was serving time in federal prison, his cellmate, Gregory Seabrook, jokingly challenged him about the teardrop tattoo on his face, saying it was "fake." Appellant said that it was real, which Seabrook took to mean that Appellant had killed someone, although he thought it could also mean that someone close to Appellant had died. Later, Appellant bragged about using a .38-caliber revolver to shoot two men in downtown Savannah during attempted armed robberies. Appellant said that he shot one man who had resisted a robbery, after which Bigham went through the man's pockets, and had shot another man on the man's front porch. Appellant also said that he threw the gun that he used in the shootings into a sewage drain near his mother's house.

Appellant told federal inmate Christopher Jackmon a similar story, saying that he had shot a man in downtown Savannah and that Bigham then went through the man's pockets. Appellant said that he threw the gun in the sewer after the shooting but forgot to

hide the bullets. Appellant told another federal inmate, Jamaal McIntyre, that a woman drove him to a robbery during which the victim "tried him, so he popped" him, adding that McIntyre could find the story on Google. Appellant told McIntyre that he could rely on the woman not to talk. Based on the information from Seabrook, Jackmon, and McIntyre, the police restarted the investigation into Corwin's death and swept the sewage drains near the home of Appellant's mother, but no gun was recovered. Bigham was also reinterviewed on January 31, 2012, and she stated for the first time that Appellant had threatened her. The record does not reveal what precipitated Appellant's eventual indictment in 2017 for Corwin's murder.

At trial, Appellant elected not to testify in his own defense. The defense theory was that all the evidence in the case was about the Buskirk shooting but had been reshaped by the State and its criminal informants into seeming like it was evidence of the Corwin shooting. Appellant recalled one of the State's witnesses; called one witness; and introduced one exhibit with a list of six names,

including both Corwin and Buskirk, which a detective had previously shown to McIntyre.

2. Appellant first contends that the statute of limitation barred his prosecution from starting in 2017 for allegedly influencing a witness in 2004. We agree.

The statute of limitation for influencing a witness ordinarily is four years. See OCGA § 17-3-1 (c) ("[P]rosecution[s] for felonies . . . shall be commenced within four years after commission of the crime . . . ."). However, because Bigham was under the age of 18 at the time of the alleged crime, the statute of limitation was seven years. See id. ("[P]rosecution[s] for felonies committed against victims who are at the time of the commission of the offense under the age of 18 years shall be commenced within seven years after the commission of the crime."). The indictment alleged that on or about June 1, 2004, Appellant knowingly threatened Bigham with the intent to prevent her from communicating to a Georgia law enforcement officer information relating to the commission of a crime, i.e., the shooting of Corwin. See OCGA § 16-10-93 (b) (1) (C).

7

The State had until June 1, 2011, to indict Appellant for influencing a witness. But the State did not indict Appellant until December 27, 2017. Thus, the statute of limitation expired more than six years before the State started its prosecution of Appellant for that offense.

The State argues that the statute of limitation was tolled for more than seven-and-a-half of the years between the alleged threat on June 1, 2004, and Appellant's indictment on December 27, 2017, because until Bigham revealed Appellant's threat to a law enforcement official on January 31, 2012, the crime was unknown. See OCGA § 17-3-2 (2) ("The period within which a prosecution must be commenced under Code Section 17-3-1 or other applicable statute does not include any period in which . . . the crime is unknown . . . ."). The State does not argue that any other tolling provision applies. The fatal flaw in the State's argument is that it is well established that "the actual knowledge of a crime victim about the crime is imputed to the State for purposes of applying the tolling provision of OCGA § 17-3-2 (2)." *Harper v. State*, 292 Ga. 557, 559 (738 SE2d 584) (2013). See also id. at 563 ("[T]he correct date to

8

apply in analyzing the statute of limitation is the date that the crime became known to the victim of the crime."); *Womack v. State*, 260 Ga. 21, 22 (389 SE2d 240) (1990) ("It seems to be well settled that . . . the knowledge of the victim is the knowledge of the State . . . ." (Citation omitted.)).

Contrary to the trial court's understanding, our recent decision in *Riley v. State*, 305 Ga. 163 (824 SE2d 249) (2019), does not undermine this well-established rule. In *Riley*, the trial court ruled that the statute of limitation for burglary and possession of a knife tolled when investigators had a single fingerprint tying someone to a murder scene, but no idea to which of the "12 to 15 possible suspects" it belonged. Id. at 165 (1). Because the trial court did not consider whether the State had sufficient information to establish probable cause to arrest Riley on the nonmurder charges – thus making Riley known to the State – we remanded the case for the trial court's consideration of that issue. Id. at 170 (3). Here, by contrast, Bigham knew about the crime the moment it was committed, so her knowledge is imputed to the State. Thus, OCGA

9

§ 17-3-2 (2) did not toll the statute of limitation.

Accordingly, we reverse Appellant's conviction and sentence for influencing a witness.

3. Appellant also contends that the trial court erred by allowing the State to introduce: (a) irrelevant evidence of a t-shirt with a threatening message worn by the boyfriend of Appellant's sister at Appellant's federal trial; and (b) irrelevant and unfairly prejudicial testimony by witness Gregory Seabrook that the teardrop tattoo on Appellant's face meant Appellant had killed someone. We disagree with both contentions.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Generally, "[a]ll relevant evidence [is] admissible, except as limited by constitutional requirements" that do not apply here. OCGA § 24-4-402. However, OCGA § 24-4-403 ("Rule 403") provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of

10

unfair prejudice." Although sometimes required, "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." (Citation omitted.) *State v. Flowers*, 307 Ga. 618, 622 (2) (837 SE2d 824) (2020). Therefore, "in reviewing [evidentiary] issues under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (Citation omitted.) *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017). We will not disturb a trial court's determination as to the admissibility of evidence "absent a clear abuse of discretion." *Harris v. State*, 313 Ga. 225, 231 (3) (869 SE2d 461) (2022).

(a) Appellant first argues that evidence of a t-shirt with a threatening message worn by the boyfriend of Appellant's sister at Appellant's federal trial and ruled by the trial judge in this case to be intrinsic to the influencing-a-witness count was not relevant because, according to Appellant, "the State introduced no evidence to establish that [the boyfriend's] alleged attempt to influence Bigham's . . . testimony was made with the authorization of

11

[Appellant]," as required by *Dukes v. State*, 290 Ga. 486 (722 SE2d 701) (2012) (decided under the old Evidence Code). However, Appellant concedes that Christopher Jackmon stated at trial that "[Appellant] said that he had his family member wear a t-shirt to stop snitching." This testimony did not directly conflict with Seabrook's testimony that Appellant never told him that Appellant ordered the boyfriend to wear the shirt. And even if Jackmon's testimony were in direct conflict with Seabrook's testimony, as Appellant claims, "it is the role of the jury to resolve conflicts in the evidence." *Hopwood v. State*, 307 Ga. 305, 305 (835 SE2d 627) (2019). Appellant's assertion about the evidence the State introduced is factually incorrect and his argument fails. Thus, the trial judge did not abuse his discretion in concluding otherwise.

(b) Appellant next argues that Seabrook's testimony about the teardrop tattoo was not relevant because Seabrook admitted that the teardrop tattoo could alternatively mean that someone close to Appellant had died. However, Seabrook's testimony corroborated Bigham's statement in her January 2012 interview that the

12

teardrop tattoo could mean that Appellant had killed someone. And the timing of when Bigham first observed the teardrop tattoo – just a few days after Corwin's shooting – further supported that Appellant had killed Corwin. Thus, Seabrook's testimony clearly was relevant.

Appellant then argues based on *Belmar v. State*, 279 Ga. 795 (621 SE2d 441) (2005), that admission of Seabrook's testimony about the teardrop tattoo was an abuse of discretion under Rule 403. In *Belmar*, a case decided under the old Evidence Code, a trial court allowed evidence of a tattoo reading "12 gauge" in a case in which Belmar was accused of murdering a man with a 12-gauge shotgun. Id. at 798 (3). This Court held that the trial court had abused its discretion because the tattoo evidence was being used to show that Belmar "had a propensity to use a 12-gauge shotgun," rather than being used for a permissible purpose, such as proving identity. Id. at 799-800 (3). Here, unlike in *Belmar*, Appellant did not suffer any unfair prejudice. The tattoo was not used for impermissible propensity purposes because Bigham's testimony indicated that

Appellant's teardrop tattoo commemorated one of the crimes with which he was charged, shooting Corwin, rather than showing that Appellant had a propensity to murder. Appellant's reliance on *Belmar* is misplaced.

The trial judge did not abuse his discretion in admitting Seabrook's testimony about the teardrop tattoo.

4. Appellant further contends that the trial court erred by allowing the state to introduce: (a) evidence of witness Walter Moon's "six prior convictions"[2] for the purpose of attacking Moon's character for truthfulness; (b) photographs from a search of Moon's residence in 2012; and (c) a post and photographs from Bigham's Facebook page. Pretermitting whether these evidentiary rulings were in error, it is highly probable that the admission of this evidence did not affect the jury's verdict.

Erroneous evidentiary rulings are subject to a harmless-error

---

[2] At trial, defense counsel inaccurately described the convictions at issue as "six felony convictions," and both Appellant and Appellees also use this characterization in their briefs. However, the convictions at issue are seven sets of convictions composed of forty-seven total counts and include both misdemeanors and felonies ranging from gun possession to murder.

14

test. See *Allen v. State*, 310 Ga. 411, 415 (2) (851 SE2d 541) (2020). A nonconstitutional error is harmless "if the State shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." (Punctuation and citation omitted.) *Smith v. State*, 313 Ga. 584, 587 (872 SE2d 262) (2022). In determining whether the error was harmless, "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Finney v. State*, 311 Ga. 1, 13 (3) (a) (855 SE2d 578) (2021).

Here, the evidence of Appellant's guilt was strong. Four different informants testified that Appellant told them that he had shot and killed a man during a robbery in downtown Savannah. Three of the informants stated that Bigham was with Appellant during the robbery, despite two of them never having met Bigham. And one of the informants, Bryant, revealed this information only weeks after the Corwin shooting took place. Likewise, Bigham stated in June 2004 that Appellant had shot a man walking in the

middle of the street during an attempted robbery. Further, Bigham said in January 2012 that, while en route to the Buskirk shooting, Appellant had a fresh teardrop tattoo and told her that he had killed a man a few days prior. Appellant is the only apparent link between the four informants and Bigham, and he provides no explanation of how the informants and Bigham independently could come to such similar testimony.

(a) The evidence of Moon's convictions likely had little effect on the jury's evaluation of whether Appellant was guilty of the crimes charged. Appellant argues his case was prejudiced by "guilt by association," suggesting that the jury might have concluded based on Appellant's association with Moon that Appellant also might be guilty of serious crimes like murder. In support of this argument, Appellant points to the State's repeated references to Moon in closing argument and Bryant's testimony that Moon was a "partner" of Appellant.

However, the evidence in this record showed that Appellant and Moon had only an incidental relationship. Despite Bryant's

16

testimony, the record provides little evidence that Moon was Appellant's "partner" or that they were anything more than acquaintances. Of the nearly 1,700 calls appearing on Appellant's call log from May 28 to June 18, 2004, only five, minute-long calls appear between Appellant and Moon. Moon himself testified that he merely knew Appellant through a mutual acquaintance, not that the pair were "partners" or even friends. This evidence indicates that even if Appellant called Moon to get rid of the gun that he used to shoot Corwin, such an interaction did not necessarily signify any closer relationship between Appellant and Moon.

Thus, because the evidence in the record does not establish that there was a strong association between Appellant and Moon – either personal or professional – but does point strongly to Appellant's guilt, it is highly probable that the admission of the evidence of Moon's convictions did not affect the verdict.

(b) The photographs from a search of Moon's residence in 2012 also likely had little effect on the jury's verdict. The photographs in question depict the exterior of the house, a shed in Moon's backyard,

17

Moon's driver's license, two cell phones, and guns and ammunition that were found during the search, including two AK-47 rifles and a pistol. As Appellant points out, none of the guns pictured were alleged to have been used by Appellant in the Corwin shooting. Further, testimony about the photographs explained that they were taken at Moon's residence in 2012. Therefore, there was no risk that the jury might mistakenly think that the pictured guns belonged to Appellant or were used by Appellant. And because, as noted above, the relationship between Appellant and Moon was incidental and the evidence of Appellant's guilt was strong, it is highly probable that admission of these photographs did not affect the jury's verdict.

(c) The post and photographs from Bigham's Facebook page also were unlikely to affect the jury's verdict. The post, which the State introduced during its direct examination of Bigham, was two photographs from 2017 of Bigham leaning against a brick wall with a caption that included the following words interspersed with various emojis: "Murder Terrorizing Dats all dey UndA_Stand Enemies Memories iGot some Bl00dy handZ"; Bigham testified that

18

the words were lyrics from a rap song. The other photographs, which the State introduced after Bigham testified on cross-examination that "if you look at the rest of the pictures on my [Facebook] page, they're all captions from songs," were three uncaptioned pictures from 2015 of Bigham posing with a man standing behind her, covering her mouth, and pointing a gun and staring at the camera.

Appellant's argument against admission of the post and photographs is based on a case decided under the old Evidence Code, *Boring v. State*, 289 Ga. 429 (711 SE2d 634) (2011), and rests on the observation that the State portrayed Bigham at trial as an unindicted co-conspirator of Appellant, so "the improper evidence was as harmful to [Appellant] as it would have been to Bigham if she were on trial for the same crimes." But Appellant cites no authority to support his transitive theory of unfair prejudice under Rule 403.

Moreover, even though Appellant and Bigham were portrayed as unindicted co-conspirators, it is highly probable that admission of the post and photographs did not affect the jury's verdict. Appellant

does not appear in either the post or photographs, both of which were from more than a decade after Corwin's shooting, nor does the post's caption reference Appellant in any way. And the photographs depict a different man than Appellant covering Bigham's mouth. Particularly in light of the strong evidence of Appellant's guilt, including Bigham's own testimony, the post and photographs were unlikely to affect the jury's verdict.

5. Appellant additionally contends that he was denied the effective assistance of counsel because of defense counsel's failure to object when the State repeatedly insisted during its closing argument that, based on his convictions, Moon was a murderer and gun runner. Again, we disagree.

To succeed on a claim of ineffective assistance of counsel, Appellant must show both that "his counsel's performance was professionally deficient and that he suffered prejudice as a result." *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)). To prove that his lawyer's performance was

20

professionally deficient, "Appellant must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances in light of the prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-183 (2) (787 SE2d 221) (2016). To prove prejudice, Appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 183 (2) (citing *Strickland*, 466 U. S. at 694). A reasonable probability is one that is "sufficient to undermine confidence in the [trial's] outcome." (Citation omitted.) *Neal v. State*, 313 Ga. 746, 751 (3) (873 SE2d 209) (2022). However, "[i]f Appellant fails to make a sufficient showing on one part of the *Strickland* test, we need not address the other part." *Washington*, 313 Ga. at 773 (3).

Here, Appellant fails to show prejudice. As discussed in Division 4 above, the evidence of Appellant's guilt was strong; the evidence at trial showed only an incidental relationship between Appellant and Moon; and admission of the evidence of Moon's convictions likely had little effect on the jury's verdict. Although the

21

State repeatedly mentioned Moon's convictions in closing argument, Appellant has not explained why these mentions were "sufficient to undermine confidence in the trial's outcome," *Neal*, 313 Ga. at 751 (3), especially when testimony by four informants and Bigham connected Appellant to the Corwin murder. Thus, Appellant has not carried his burden to prove that he suffered prejudice as a result of his trial counsel's performance, and Appellant's claim of ineffective assistance of counsel fails. See *Walker v. State*, 312 Ga. 232, 242 (862 SE2d 285) (2021) ("[E]ven assuming we were to conclude that the remark was improper and that trial counsel's failure to object was objectively unreasonable, we cannot say that, had trial counsel objected, there is a reasonable probability that the result of Appellant's trial would have been different."); *Richardson v. State*, 304 Ga. 900, 903 (823 SE2d 321) (2019) ("[E]ven assuming that trial counsel was deficient for failing to object [to a 'troubling' statement in closing argument], Appellant has failed to demonstrate prejudice.").

6. Appellant finally contends that he is entitled to a new trial

22

based on cumulative error. However, even assuming, without deciding, that the trial judge erred in each of the evidentiary rulings discussed in Division 4 and that trial counsel was deficient in not objecting during the State's closing argument, Appellant has failed to demonstrate that the "combined prejudicial effect" of these individually harmless errors "requires a new trial." *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020). Appellant did not rebut the testimony of five witnesses that he had confessed to shooting someone under circumstances matching those of Corwin's shooting, so errors on tangential matters were highly unlikely to "so infect[] the jury's deliberation that they denied the petitioner a fundamentally fair trial." (Citation and punctuation omitted.) Id. Thus, Appellant has not carried his burden to show cumulative error requiring the granting of a new trial. See *Jones v. State*, ___ Ga. ___ (___ SE2d ___) (Sept. 20, 2022) (slip op. at 25-27).

Accordingly, we affirm the judgment of conviction for felony murder and reverse the judgment of conviction for influencing a witness.

23

*Judgment affirmed in part and reversed in part. All the Justices concur.*