319 Ga. 550
FINAL COPY

S24A0526. WILSON v. THE STATE.

LaGrua, Justice.

In October 2018, Appellant Demon Wilson was convicted of malice murder and related crimes for the shooting death of Desmond Kinnemore.[1] On appeal, Wilson contends that (1) the evidence was insufficient to warrant a conviction based on circumstantial

_____

[1] The crimes occurred in Rockmart on January 8, 2013. On March 17, 2015, a Polk County grand jury indicted Wilson for malice murder (Count 1), two counts of felony murder predicated on aggravated assault (Counts 2 and 3), two counts of aggravated assault (Counts 4 and 5), and possession of a firearm by a convicted felon (Count 6). The District Attorney later dismissed Count 6. Wilson was tried October 2 to 4, 2018, and the jury found him guilty of all counts. The trial court sentenced Wilson to serve life in prison without the possibility of parole for Count 1. For the purposes of sentencing, the trial court merged Counts 4 and 5 into Count 2 and Counts 2 and 3 into Count 1. However, Counts 2 and 3 were vacated by operation of law, and the trial court should have merged Counts 4 and 5 into Count 1. "Nevertheless, the trial court's incorrect nomenclature did not affect Appellant's sentence because the trial court only imposed a sentence for the malice-murder count[,]" so "there is no sentencing error to correct." *Williams v. State*, 316 Ga. 147, 153 (3) (886 SE2d 818) (2023) (citation and punctuation omitted). Through trial counsel, Wilson filed a timely motion for new trial, which the trial court denied. The trial court later vacated its order, and Wilson filed an amended motion through new counsel. After holding evidentiary hearings, the trial court denied the amended motion for new trial on February 16, 2023. Wilson filed a timely notice of appeal, and his case was docketed to this Court's term beginning in April 2024 and was submitted for a decision on the briefs.

evidence; and (2) the trial court erred by not permitting evidence of other suspects. For the reasons explained below, we affirm.

The evidence presented at trial showed that sometime after 10:00 a.m. on January 8, 2013, Cindy Bowman was driving on Morgan Valley Road in Rockmart with her adult son John Bowman. The Bowmans testified that they saw a red sedan driving in their direction, and they also saw a man, later identified as Kinnemore, walk onto the road in front of them. Cindy stopped her car, and the red sedan stopped as well. Kinnemore walked up to the driver's side of the red sedan. John testified that he heard a single, loud pop, and then he saw Kinnemore walk off the road and fall into a ditch by the road. Cindy testified she did not hear any noise, but she saw Kinnemore clutch his stomach and stumble backward into the ditch. Neither observed the driver of the red sedan with a gun. Immediately after, the red sedan slowly drove away, passing the Bowmans. John did not look at the driver, but Cindy could see that the driver was a man and the only occupant of the car. The Bowmans drove away.

2

At 10:32 a.m., a woman — who lived adjacent to the section of Morgan Valley Road where this encounter occurred — was inside her house, heard four to five gunshots, and called 911. The woman and the Bowmans testified that gunshots were commonly heard in the neighborhood. Police arrived and found Kinnemore's dead body lying in the ditch with a gunshot wound to the back of the head. No bullets were found, but investigators located a single, spent .223 caliber shell casing on the road near Kinnemore's body. Investigators also found a bullet hole in a house approximately 250 feet down the road. A forensics examiner testified that the direction and size of the bullet hole in the house indicated that the bullet was fired from a high-powered firearm from the vicinity of where Kinnemore approached the red sedan.

The Bowmans returned to the scene and told police what they saw, including that the shooter drove a red sedan. A responding police officer testified that John Bowman told him that the red sedan's headlight was slightly discolored and there was something hanging from the rear-view mirror. That afternoon, that officer

stopped a red sedan matching the description provided by the Bowmans on the street parallel to Morgan Valley Road. The car was a 2001 Cadillac Seville, and Wilson was driving.

The officer told Wilson that the police were investigating a shooting that occurred earlier that morning. Wilson told the officer that he did not know who had been shot, though later in the conversation Wilson commented that he "heard that Bud had been robbing people." The officer testified that "Bud" was Kinnemore's nickname. Wilson also told the officer that he left Rockmart for Rome around 10:00 a.m. that day, but later stated that he perhaps left Rockmart as early as 8:00 a.m. Wilson told the officer that he visited a Walmart in Rome, but he could not say which of two specific Walmarts he visited. The parties stipulated that surveillance footage from the two Walmarts did not show Wilson visiting either store that day. Wilson also said that he went with a woman to Waffle House that morning but would not provide her name. Wilson later said they went to Huddle House, and when asked to clarify, he said they went to both Waffle House and Huddle House.

The officer smelled marijuana coming from Wilson's Cadillac during this conversation, and a drug dog "alerted" on the vehicle. Police searched the Cadillac and found a small bag of marijuana and a .22 caliber rifle. Police let Wilson leave that day, but eight days later they arrived at his house with an arrest warrant for possession of a firearm by a convicted felon. After reading him his *Miranda* rights,[2] police interviewed Wilson at his house, and he denied any involvement in Kinnemore's death. With Wilson's consent, police searched his property and found two .223 caliber cartridges, one inside the house and one outside. Police also impounded and searched Wilson's Cadillac, finding two .223 caliber cartridges and one spent .223 caliber shell casing in the back seat. A firearms expert testified that the .223 caliber shell casing in the Cadillac was fired from the same firearm as the .223 caliber shell casing found at the scene of the shooting.

Police found no firearms at Wilson's house, but Wilson's cousin testified that he sold Wilson an AR-15 a few months prior which uses

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

.223 caliber bullets. The medical examiner testified that Kinnemore died from a bullet wound to the back of the head, but she could not conclusively identify the type of bullet or firearm used. She theorized that the wound was indicative of a smaller firearm like a handgun, but she also explained there are scenarios where the bullet could have been fired from a high-powered rifle firing .223 caliber rounds.

Ten days after the shooting, police showed the Bowmans a photograph of Wilson's Cadillac, and both identified it as the red sedan that they saw on January 8.[3] Two months later, Wilson was indicted for Kinnemore's murder.

At trial, Wilson's father testified that Wilson and Wilson's uncle picked up the Cadillac from an auto shop on the morning of January 8, and surveillance footage showed Wilson and his uncle leaving the auto shop at approximately 9:53 a.m. Wilson's father testified that they returned to his house with the Cadillac "around about" 10:00 a.m., then Wilson left the house in the Cadillac "sometime after" 10:00 a.m. The house was a one-minute drive from

---

[3] John also identified Wilson's Cadillac during trial.

the scene of the shooting. Wilson's father also testified that he had never seen Wilson with a high-powered rifle and that he knew of no dispute between Kinnemore and Wilson, but the two did know each other from living in the same neighborhood.

1. Wilson contends that the evidence was insufficient as a matter of Georgia statutory law to support his convictions because there were multiple hypotheses consistent with the evidence that are not consistent with his guilt.[4]

When a conviction is based on circumstantial evidence, OCGA § 24-14-6 requires that "the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other *reasonable* hypothesis save that of the guilt of the accused." (Emphasis supplied.) "Whether any alternative hypotheses are reasonable and whether the circumstantial evidence excludes any such hypotheses

---

[4] In his brief before this Court, Wilson cites *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), in the section setting out the standard of review. However, Wilson never argues that the evidence was insufficient as a matter of due process — only that it was insufficient under OCGA § 24-14-6. See *Davenport v. State*, 309 Ga. 385, 398-399 (4) (b) (846 SE2d 83) (2020) (holding that this Court no longer routinely reviews sua sponte the constitutional sufficiency of the evidence in non-death penalty cases).

7

are questions for the jury[,] and we will not disturb the jury's findings on those questions unless they are insupportable as a matter of law." *Rashad v. State*, 318 Ga. 199, 206 (2) (897 SE2d 760) (2024) (citation and punctuation omitted).

Assuming without deciding that Wilson's conviction was based solely on circumstantial evidence, we hold that it satisfies OCGA § 24-14-6. Wilson first argues that it is a reasonable hypothesis that the red sedan identified by the Bowmans was not even involved in the shooting or that someone else drove the red sedan. But the Bowmans witnessed Kinnemore approach the red sedan before falling into the ditch — where he was found dead — and one of the Bowmans and a neighbor heard gunshots. Later that day, Wilson was seen driving a Cadillac matching the red sedan's description near where the shooting occurred, and the Bowmans identified Wilson's Cadillac as the red sedan that they saw. Testimony from Wilson's father placed Wilson in the Cadillac a few minutes before and a short distance away from the shooting, which is contrary to what Wilson told police. Evidence also showed that Wilson owned a

firearm that used the type of round matching the shell casing found on the road at the scene. And evidence showed that the shell casing was ejected from the same firearm as a shell casing found in Wilson's Cadillac. Wilson argues that the shell casing on the road could have landed there by other means or that Kinnemore could have instead been shot by a handgun. However, the medical examiner did not expressly rule out that Kinnemore's injuries could have been caused by a high-powered rifle, and the crime scene investigator testified that the bullet hole found on a house near the scene was caused by a high-powered weapon fired from the area where the red sedan was.

In sum, we conclude that the evidence presented at trial authorized the jury to reject as unreasonable Wilson's alternative hypotheses. Indeed, "[u]nder these circumstances, it was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence and to decide whether the defense theory that an unknown assailant was the killer was reasonable and not excluded by the other evidence." *Clark v. State*, 309 Ga. 473, 478 (847 SE2d 364) (2020). Because the jury's findings

9

were sufficiently supported by the evidence, "we will not disturb" those findings. *Rashad*, 318 Ga. at 206 (2) (citation and punctuation omitted). See *Taylor v. State*, 312 Ga. 1, 6 (2) (860 SE2d 470) (2021) (affirming, in a statutory sufficiency challenge, the jury's rejection of an appellant's alternate hypothesis that she was not at the scene of the shooting or in possession of the murder weapon when the evidence showed "that Appellant had a motive for the shootings, that [an eyewitness] was with the victims at the time of the shootings, that a car matching the description of Appellant's was involved in the shootings, and that Appellant had a handgun with her and in her vicinity during the day of the shootings").

2. Wilson next contends that the trial court erred by not permitting testimony about other suspects. At trial, Wilson's trial counsel questioned lead Detective David Gowens regarding other leads he did not follow during the investigation. The State made a hearsay objection. Outside the presence of the jury, Wilson's trial counsel proffered that two men — specifically two brothers — had recently threatened Kinnemore in connection with a court

proceeding where Kinnemore was going to testify against them. Detective Gowens testified that he investigated the rumor, though he did not interview the brothers, and that he found no credible evidence to substantiate what he called "street talk" against them. Rather, one of the brothers was in jail during Kinnemore's murder. Further, Detective Gowens testified that there was also a rumor that the brothers hired Wilson to murder Kinnemore. Wilson's defense counsel next questioned Detective Gowens about several other individuals he did not interview, including a man who claimed that Kinnemore robbed him. But Detective Gowens repeatedly testified that his investigation did not uncover any information that some other specific person may have committed this crime.

At the conclusion of the proffer, Wilson's trial counsel explained why he should be allowed to ask Detective Gowens about the brothers, and the trial court answered "Sure" and "Go ahead." But when Wilson's trial counsel next asked, "I would like to . . . tell the jury [Detective Gowens] had other leads[,]" the trial court answered, "No, I'm not going to allow you to just speculate. . . ." After

11

the jury returned to the courtroom, Wilson's trial counsel did not ask Detective Gowens any questions about the brothers or any leads other than the brothers.

Wilson now contends he should have been permitted to ask about both the brothers and the other leads. The State contends that the trial court permitted testimony regarding the brothers, and the trial court only excluded the more speculative testimony regarding suspects other than the brothers. The State also contends that all of Detective Gowens's proffered testimony was inadmissible because it failed to raise a reasonable inference of Wilson's innocence. See *Pittman v. State*, 318 Ga. 819, 826 (4) (901 SE2d 90) (2024) ("[F]or such third-party guilt evidence to be admissible, it must raise a reasonable inference of the defendant's innocence, and must directly connect the other person with the corpus delicti, or show that the other person has recently committed a crime of the same or similar nature." (citations and punctuation omitted)). However, we need not make a determination about what the trial court actually excluded or whether the trial court abused its discretion in doing so, because

any error was harmless.

"A trial court's evidentiary error warrants reversal only if it was harmful. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Jivens v. State*, 317 Ga. 859, 863 (2) (896 SE2d 516) (2023) (citation and punctuation omitted). "The burden to make this showing is the State's to bear, and in determining whether the showing has been made, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have weighed it." *Johnson v. State*, 316 Ga. 672, 684 (4) (c) (889 SE2d 914) (2023). Here, the excluded testimony merely alleged that some other individuals might have had a motive to kill Kinnemore. Even if the proffered evidence of others' motives would have helped Wilson's defense, we doubt it would have helped meaningfully. The proffer was speculative and non-specific — Detective Gowens never uncovered any evidence connecting another person to the shooting itself. Rather, Detective Gowens explained that some of the "street talk" he would have testified about still inculpated Wilson as the

shooter. See *Oree v. State*, 280 Ga. 588, 593 (5) (630 SE2d 390) (2006) (holding that it was harmless error for the trial court to exclude testimony that the shooting victim had threatened a co-indictee because other evidence still showed that defendant was a party to the crime). The excluded testimony also did nothing to rebut other strong evidence against Wilson presented at trial, including the evidence that Wilson was driving near the crime scene at the time of the shooting in a vehicle identified as the shooter's vehicle and was in possession of a shell casing that was ejected from the same firearm as a shell casing found at the crime scene. See *Jordan v. State*, 303 Ga. 709, 712-713 (3) (814 SE2d 682) (2018) (holding that evidentiary error was harmless in light of other evidence presented at trial showing that Appellant interacted with the victim before the shooting, shots were fired from Appellant's vehicle, and shell casings found at the scene came from a firearm discovered in Appellant's home). Therefore, we hold that it is highly improbable that the alleged error contributed to the verdict.

*Judgment affirmed. All the Justices concur.*

Decided August 13, 2024.

Murder. Polk Superior Court. Before Judge Murphy.

*John Monroe Law, John R. Monroe*, for appellant.

*Jack Browning, Jr., District Attorney, Jaeson R. Smith, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, M. Catherine Norman, Assistant Attorney General*, for appellee.