NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia


Decided: December 10, 2024


S24A1096. SHARKEY v. THE STATE.


COLVIN, Justice.

Appellant John Deangelo Sharkey appeals following his convictions for malice murder and armed robbery in connection with the shooting death of Dominique Barker.[1] On appeal, Appellant challenges the constitutional sufficiency of the evidence supporting

---

[1] The crimes occurred on December 6, 2017. On February 8, 2018, a Clayton County grand jury indicted Appellant for malice murder (Count 1), aggravated assault (Count 2), felony murder (Count 3), and armed robbery (Count 4). A jury trial was held from January 13 to 16, 2020. The jury found Appellant guilty of all counts. The trial court sentenced Appellant to life in prison without the possibility of parole for malice murder (Count 1) plus 20 years consecutive for armed robbery (Count 4). The aggravated-assault count (Count 2) merged with Count 1 for sentencing purposes, and the felony-murder count (Count 3) was vacated by operation of law. Appellant timely filed a motion for new trial on January 21, 2020, and amended the motion through new counsel on February 23, 2021. On February 29, 2024, following a hearing, the trial court entered an amended order denying Appellant's amended motion for new trial. Appellant filed a timely notice of appeal on March 6, 2024. The case was docketed to this Court's August 2024 term and submitted for a decision on the briefs.

his convictions. He also argues that the trial court abused its discretion in excluding a video recording that showed a four-year-old child, who was present when the shooting occurred, identifying a man other than Appellant in a photo lineup. And Appellant contends that his trial counsel was constitutionally ineffective for failing to take measures to admit the video recording of the child's photo identification under the child-hearsay statute. As explained below, the trial evidence was more than sufficient to support Appellant's convictions. And because there was strong evidence of Appellant's guilt, any trial-court error or deficient performance regarding admission of the video recording was harmless and nonprejudicial. Accordingly, we affirm Appellant's convictions.

1. The trial evidence showed the following. Barker's wife, Janaille Barker ("Janaille"), testified that, in December 2017, she and Barker were living in a duplex in College Park with her sister and several children, including her eight-year-old daughter (J. H.); her seven-year-old niece (R. W.); Barker's son (D. B.), who had just turned four years old; and her six-month-old daughter (F. B.).

2

Janaille testified that Barker "sold weed" to make money, that he made a substantial amount of money doing so, and that he stored "weed" and some "money" in the kitchen cabinet.

Gerald Leonard, a close friend of Barker's, testified that he had introduced Appellant to Barker, and that the three men had smoked marijuana together. Leonard said that he knew Appellant through his housemate, Troyaire Moore, who had been romantically involved with Appellant. Leonard and Moore testified that Appellant had lived in their house for a month or two in 2017, but that he moved out a couple weeks before the shooting. Moore recalled that Appellant had a firearm when he lived with her. And according to Moore, her relationship with Appellant ended before he moved out, and he was "essentially kicked out" of the house because he was unable to pay rent.

Leonard and Moore testified that Appellant was from St. Louis, Missouri, and Janaille said that she knew Appellant by the nickname "St. Louis." Janaille and Leonard recalled Appellant being at Barker's house twice prior to the date of the shooting. And

Janaille testified that, during the second visit, which was on Thanksgiving, Appellant asked Barker how he made so much money and how Appellant could make money like that.

As to the day of the shooting, the trial evidence showed that Moore exchanged text messages with Appellant between 10:47 and 10:59 a.m. The text messages showed that Moore contacted Appellant to ask if he had "moved back" to St. Louis and if he was "good." In response, Appellant sent messages to Moore expressing a belief that someone in her house had stolen his gun, and stating that he had only gone to St. Louis to report his gun stolen and to buy a new gun, that he was on his way back, and that he would arrive around 7:15 p.m. Moore explained at trial that St. Louis, Missouri was "eight and a half" to "nine hours" away "by car."

Janaille testified that Barker's phone records showed that, at 1:27 p.m. on the day of the shooting, Barker's phone placed a call to a St. Louis, Missouri phone number, which Moore identified as Appellant's. Leonard testified that, later that afternoon, around 2:00, he called Appellant and spoke with him over the phone. And

4

according to Janaille, Barker's phone records showed that Appellant's phone called Barker's phone at 3:31 p.m.

At some point during the afternoon, J. H. and R. W. came home from school. J. H. and R. W. testified that, when they got home, Barker, D. B., and F. B. were in the living room of the duplex. The girls said that Barker was playing a video game, D. B. was watching TV or using a tablet, and F. B. was asleep on the couch. And J. H. and R. W. further said that they went together into one of the bedrooms to play games on their phones.

According to J. H. and R. W., while they were playing games in the bedroom, they heard a "big boom," and they briefly hid under the covers before going out into the living room to see what happened. J. H. and R. W. recalled that, when they got to the living room, they saw D. B. and F. B. still on the couch, Barker lying on the kitchen floor, and a man holding a gun in the kitchen.[2] And both girls testified that J. H. called Barker's name, but that he did not respond.

_____

[2] According to J. H., D. B. was still playing on his tablet.

Neither J. H. nor R. W. recalled ever having seen the man who had the gun before, but they described him as having dreadlocks, and J. H. further testified that the dreadlocks were short and gold-tipped. The girls testified that they saw the man "grabbing stuff" from the kitchen cabinets. Elaborating on the point, J. H. said that he took a "big glass jar with . . . green stuff in it," and R. W. said that he took "some money." J. H. further testified that she asked the man if Barker was "gonna be okay," and the man responded, "yeah." Then, according to the girls, the man left the house and ran down the street. After the man left, J. H. and R. W. ran to the house of their next-door neighbor, Mesteeniquette Mickles, and told her what had happened.

Mickles testified that she heard gunshots while inside her house, and shortly thereafter she ran to her front door, where she found J. H. and R. W. According to Mickles, she then went inside the girls' duplex, where she saw D. B. sitting on the couch and Barker

lying on the kitchen floor.[3] Mickles said that, after seeing blood around Barker's head, she took the children out of the house and called 911 to report that Barker had been shot.

Officers were called to the crime scene at 3:52 p.m. and arrived minutes later. Responding officers testified that they could smell marijuana upon entry to Barker's duplex, and that a "trail[ ]" of marijuana "crumbs" and "buds" led from the living room to the kitchen. In the kitchen, officers observed glass jars containing marijuana inside an open cabinet, marijuana scattered across the stove, countertops, and floor, and Barker lying on his back on the floor with a pool of blood under his head. On the kitchen counter, officers also found a cell phone, which they later determined had a phone number matching Appellant's.

Leonard testified that, shortly after the shooting, he learned that Barker had been shot. And he said that he tried to contact Appellant later that night, but, when he called Appellant's phone,

---

[3] When asked if D. B. appeared to know what was going on, Mickles responded, "No."

he got a message that Appellant's phone number was "no longer in service."

A medical examiner testified that Barker died from two gunshot wounds to the head, one to the face and the other to the back of the head. And she concluded that Barker was shot in the face from a distance of no more than "a couple of feet," based on the presence of stippling and the absence of soot near the entry wound.

Six days after the shooting, a detective separately presented J. H. and R. W. with photo lineups containing six pictures of men with dreadlocks. Janaille, who was present for the photo lineups, testified that, although the police had not told her the identities of the people in the lineup, she recognized Appellant in the lineup and knew who he was. And J. H.'s and R. W.'s photo-lineup identifications, as well as the video recordings of their identifications, showed that both girls identified Appellant as the man who had been in their house with a gun when Barker was shot. Appellant was arrested in St. Louis the next day.

2. Appellant contends that the trial evidence was

8

constitutionally insufficient to support his convictions for malice murder and armed robbery. We disagree. As explained below, the evidence of Appellant's guilt was not just sufficient but strong.

"Evidence is sufficient as a matter of constitutional due process if a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Pierce v. State*, 2024 WL 4350982, __ Ga. __, __ (2) (__ SE2d __) (2024) (citation and punctuation omitted). "When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." Id. (citation and punctuation omitted).

Here, the trial evidence was sufficient to support Appellant's convictions for malice murder and armed robbery. As to the identity of the shooter, the evidence was strong. Both J. H. and R. W. identified Appellant as the man they saw standing with a gun over Barker's body and taking items from the kitchen cabinets. See *Scott v. State*, 309 Ga. 764, 765-766 (1) (848 SE2d 448) (2020) (sufficient evidence of malice murder where an eyewitness identified the

9

defendant in a photo lineup and at trial as the man who came to a drug dealer's house, shot the drug dealer, and then searched the drug dealer's cabinets). And Appellant's cell phone, which had been used to communicate with Moore and Leonard earlier in the day and had called the victim's phone minutes before the shooting, was also found at the crime scene. See *Brown v. State*, 291 Ga. 892, 894 (1) (734 SE2d 23) (2012) (sufficient evidence of malice murder where, among other things, "phone records show[ed] that [the defendant] and the victim were communicating prior to the shooting and that [the defendant] was in the vicinity of the hotel [where the shooting occurred] during that time," and "a note found in the victim's apartment bore [the defendant's] name"); *Clemons v. State*, 288 Ga. 445, 445 (1) (704 SE2d 762) (2011) (sufficient evidence of malice murder where, among other things, letters addressed to the defendant were found near the victim's body), overruled on other grounds by *Pounds v. State*, 309 Ga. 376 (846 SE2d 48) (2020).

As to the malice-murder count, the trial evidence strongly supported a finding that Appellant deliberately killed Barker. See

OCGA § 16-5-1 (a) ("A person commits the offense of [malice] murder when he unlawfully and with malice aforethought . . . causes the death of another human being."); OCGA § 16-5-1 (b) ("Express malice is that deliberate intention unlawfully to take the life of another human being . . . ."). The medical examiner testified that the victim was shot in both the front and the back of the head, and that the gunshot to the front of the head was fired from close range. See *Pierce*, 2024 WL 4350982, __ Ga. at __ (2) (sufficient evidence of malice murder where the victim was "shot through the back of his neck from near contact range" (punctuation omitted)). And Appellant's text-message exchange with Moore during the morning of the shooting, in which he claimed that his gun had been stolen and that he was currently in St. Louis, Missouri, supported an inference that Appellant planned to use his gun to commit murder. Specifically, the jury could have reasonably inferred that Appellant's text messages represented an attempt to fabricate an alibi in advance of the robbery because the same phone Appellant used to text Moore was present at the crime scene less than five hours later,

and the evidence showed that it would have taken Appellant more than eight hours to drive to College Park if he had in fact been in St. Louis, Missouri when he texted Moore. Cf. *Somchith v. State*, 272 Ga. 261, 262 (1) (527 SE2d 546) (2000) (sufficient evidence of malice murder where, among other things, the defendant lied about being armed before the shooting).

In addition, the trial evidence authorized the jury to find that Appellant was conscious of his guilt, and therefore guilty of malice murder. Specifically, J. H. and R. W. testified that Appellant quickly fled the scene after falsely telling the girls that the victim would be all right. See *Maynor v. State*, 317 Ga. 492, 497 (2) (a) (893 SE2d 724) (2023) ("Appellant fled the immediate area, from which the jury could infer consciousness of guilt, and thus guilt itself." (citation and punctuation omitted)); *Wise v. State*, 292 Ga. 447, 448-449 (1) (738 SE2d 580) (2013) (sufficient evidence of malice murder where, among other things, the defendant lied to the victim's neighbors about the victim before fleeing the scene). And although Appellant's cell phone had service earlier in the day and had been used to

12

communicate with Moore, Leonard, and Barker, Leonard testified that Appellant's phone service was disconnected by the time he called Appellant again that evening. See *Ford v. State*, 319 Ga. 215, 217 (1) (903 SE2d 1) (2024) (noting that the evidence showed a consciousness of guilt because the defendant had frequent contact with the victim's friend before the killing but stopped responding to the friend and blocked him on social media after the killing); *Nunnally v. State*, __ Ga. __, __ (2) (a) (905 SE2d 550) (2024) (sufficient evidence of malice murder where, among other things, the defendant "attempted to delete call logs with [the victim] from his phone to conceal his guilt").

The trial evidence also strongly supported a jury finding that Appellant committed armed robbery. See OCGA § 16-8-41 (a) ("A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon . . . ."). The evidence showed that Barker was shot twice in the head, and J. H. and R. W. testified that, while Appellant was holding a

13

gun and Barker was lying unresponsive on the kitchen floor, Appellant took "money" and a jar containing "green stuff," which the evidence showed was marijuana, from the kitchen cabinet. See *Benton v. State*, 305 Ga. 242, 245 (1) (b) (824 SE2d 322) (2019) ("Where, as here, the evidence is sufficient to authorize a finding that the theft was completed *after* force was employed against the victim, a conviction for armed robbery is authorized." (citation and punctuation omitted; emphasis supplied)). "Although the State was not required to prove motive," the evidence also supported a finding that Appellant had a motive to commit the armed robbery because Appellant was known to use marijuana, was unable to pay rent, knew Barker had large sums of money, and had previously expressed a desire to be as wealthy as Barker. *Hall v. State*, 308 Ga. 475, 478 (841 SE2d 672) (2020). And the evidence discussed above, which showed that Appellant planned in advance to use his firearm to commit a crime and that he was conscious of his guilt after the fact, also supported a guilty verdict as to armed robbery. Accordingly, this claim fails.

3. Appellant argues that the trial court abused its discretion in excluding a video recording that showed four-year-old D. B. identifying the photo of a man other than Appellant during a photo lineup. And relatedly, Appellant contends that his trial counsel was constitutionally ineffective because counsel failed to take steps to admit the video recording of D. B.'s photo-lineup identification under Georgia's child-hearsay statute.[4] Specifically, Appellant argues that trial counsel was deficient because he failed to file a pretrial notice and to subpoena D. B. to testify at trial. We conclude, however, that any trial-court error was harmless and any deficient performance was nonprejudicial.

"Erroneous evidentiary rulings are subject to a harmless-error

---

[4] In relevant part, Georgia's child-hearsay statute provides:

A statement made by a child younger than 16 years of age describing any act of . . . physical abuse performed . . . on another in the presence of such child shall be admissible in evidence by the testimony of the person to whom made if the proponent of such statement provides notice to the adverse party prior to trial of the intention to use such out-of-court statement and such child testifies at the trial . . . .

OCGA § 24-8-820 (a).

15

test," and "[a] nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict." *Jones v. State*, 315 Ga. 117, 122 (4) (880 SE2d 509) (2022) (citation and punctuation omitted). To establish prejudice from trial counsel's deficient performance, as a defendant is required to do to prevail on an ineffective-assistance-of-counsel claim, "a defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." *Allen v. State*, 317 Ga. 1, 8–9 (4) (890 SE2d 700) (2023) (citation and punctuation omitted). Whether we are assessing harm from a nonconstitutional error or prejudice from counsel's deficient performance, "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have" weighed the evidence. *Jones*, 315 Ga. at 122 (4) (citation and punctuation omitted) (addressing harm from nonconstitutional evidentiary errors). See *Harmon v. State*, 319 Ga. 259, 265 (3) (903 SE2d 28) (2024) (addressing prejudice from counsel's deficient performance).

16

Here, any trial-court error in excluding the video recording of four-year-old D. B.'s photo-lineup identification was harmless. As discussed in Division 2, the evidence of Appellant's guilt was strong. And in particular, the evidence regarding the shooter's identity strongly supported a finding that Appellant was the shooter because Appellant's cell phone, which communicated with Barker's cell phone minutes before the shooting, was found in the kitchen where Barker was killed, and both eight-year-old J. H. and seven-year-old R. W. identified Appellant as the man they saw with a gun standing over Barker's unresponsive body. Considering this evidence, it is highly probable that seeing D. B.'s identification of a man other than Appellant in the photo lineup would not have changed the jury's finding that Appellant was the shooter. This is particularly true because there was no other evidence presented at trial establishing the identity of the other man D. B. identified or linking that man to the crimes; J. H.'s and Mickles's testimony that D. B. continued playing on his tablet and did not appear to know what was going on after the shooting indicated that D. B. was not paying close attention

to the circumstances surrounding the shooting; the video recording of D. B.'s photo identification showed that, at times throughout the photo lineup, D. B. appeared to be distracted, noncompliant, and more interested in drawing a picture on the photo lineup than in cooperating with the investigator; and, when the shooting occurred, D. B. was quite young compared to the girls who positively identified Appellant. See *Wilson v. State*, 319 Ga. 550, 555-556 (2) (905 SE2d 557) (2024) (holding that any error in excluding testimony "that some other individuals might have had a motive to kill [the victim]" was harmless because the testimony was "speculative," there was no "evidence connecting another person to the shooting," and the testimony did not "rebut other strong evidence against [the defendant]," including that he "was driving near the crime scene at the time of the shooting in a vehicle identified as the shooter's vehicle"); *Talley v. State*, 314 Ga. 153, 161 (2) (875 SE2d 789) (2022) (holding that an assumed trial-court error regarding admission of evidence was harmless where, "as to the identity of the shooter, the evidence against [the defendant] was strong" because a victim

18

"identified [the defendant] as the shooter," and the "cell phone evidence" indicated that the defendant was in the location of the shooting around the time of the shooting); *Jones*, 315 Ga. at 122-124 (4) (assuming that the trial court made several erroneous evidentiary rulings and concluding that any error was harmless because there was "strong" evidence of the defendant's guilt, and the admission of the challenged evidence would have had "little" impact on the jury's assessment of the trial evidence as a whole).

For the same reasons that it is highly probable that the result of the trial would not have been different if the trial court had permitted Appellant to play the video recording of D. B.'s photo-lineup identification for the jury, there is no reasonable probability that the result of the trial would have been different if trial counsel had taken the steps necessary to admit that video recording under the child-hearsay statute. See, e.g., *Allen*, 317 Ga. at 7-8, 12 (3), (4) (d) (concluding that related claims of trial-court error and ineffective assistance of counsel were harmless and nonprejudicial, respectively, for the same reasons); *Jones*, 315 Ga. at 122-125 (4), (5)

19

(holding that erroneous evidentiary rulings and assumed ineffective assistance of counsel were harmless and nonprejudicial, respectively, because the evidence of the defendant's guilt was strong); *Clarke v. State*, 308 Ga. 630, 633-636 (2), (3) (842 SE2d 863) (2020) (holding that, for the same reasons that it was highly probable that an evidentiary ruling was harmless, a related ineffective-assistance-of-counsel claim failed for lack of prejudice).[5] Accordingly, these claims fail.

*Judgment affirmed. All the Justices concur.*

---

[5] We note that cumulative prejudice from the assumed trial-court error and counsel's assumed deficient performance does not warrant a new trial "because the harm from the assumed error[ ] and assumed deficiency is the same," namely, that Appellant was unable to show the jury the video recording of D. B.'s photo-lineup identification. *Zayas v. State*, 319 Ga. 402, 414 (4) (902 SE2d 583) (2024) (citation and punctuation omitted).